## CHARLESTON.

GREER *et al. v.* O'BRIEN *et al.*

Submitted February 10, 1892.—Decided March 26, 1892.

1. FRAUD—BURDEN OF PROOF.

The rule is that he who alleges fraud must prove it, and the supposed exceptions to this rule are more apparent than real. There may be *prima facie* fraud, or fraud may be proved by a number of concurrent circumstances; nevertheless, so long as the scales are evenly balanced, the defendant, against whom fraud is alleged, must prevail. (p. 281.)

2. FRAUD—VOLUNTARY CONVEYANCE.

The second section of chapter 74 of the Code of West Virginia makes a clear distinction between the rights of existing and subsequent creditors as to a voluntary conveyance, and such a conveyance can not be impeached by subsequent creditors on the mere ground of its being voluntary and of the party making it, or at whose instance it was made, being indebted to some extent. There must be proved by such subsequent creditors an actual

fraudulent view or intent by proving additional circumstances sufficient to show fraud in fact. (p. 283.)

3. FRAUD—VOLUNTARY CONVEYANCE.

Since the enactment of said section and chapter, voluntary conveyances are void as to prior creditors, not because they are fraudulent, but because they are voluntary, and because of the consequent subordination of the right of the donee to that of all prior creditors. (p. 283.)

4. FRAUD—VOLUNTARY CONVEYANCE.

In the application of this act to voluntary conveyances or donations, made since its passage, which are confessedly and on their face voluntary, the act itself should be regarded as embraced in the purview of such donation or settlement. (p. 284.)

5. FRAUD—VOLUNTARY CONVEYANCE.

The said section should receive a plain, common-sense, remedial construction, and not be frittered away, by resorting to refinements, and to the complicated and almost undeterminable questions of fact and evidence which formerly embarrassed the courts, but which our act was intended to cut up by the roots. (p. 284.)

6. FRAUD—VOLUNTARY CONVEYANCE.

Under said act, the courts of this state have no power to substitute subsequent creditors to the shoes of prior creditors, or to confound the two classes which the act was intended to make, and has made, absolutely distinct. (p. 284.)

7. FRAUD—VOLUNTARY CONVEYANCE.

Prior creditors are not prejudiced by a settlement known and acknowledged to be voluntary, for the reason that such a settlement is entirely abortive to withdraw the property from their debts. Such deed is void as to them, not because it is fraudulent, but because it is voluntary. In ordinary cases, therefore, the Circuit Court has only to ascertain what debts existed when such settlement was made, and to declare it as to them void and as to all subsequent creditors valid. If the latter desire to attack the deed, the burden is on them to prove an actual fraudulent intent attaching to its inception and execution. The mere circumstances that the settlement is voluntary, and the party who made it indebted at the time, have ceased to have any material weight, until the subsequent creditor has connected them, as links in a chain, with some covinous device or circumstance, indicating actual fraudulent intent. (p. 284.)

8. FRAUD—VOLUNTARY CONVEYANCE.

Point 4 of the syllabus of *Rogers* v. *Verlander*, 30 W. Va. 651 (5 S. E. Rep. 847) explained and reconciled. (p. 286.)

9. FRAUD—VOLUNTARY CONVEYANCE.

The true rule of construction in this State, as recognized and established by this Court, is one which preserves the full remedial value of section 2 of said act, and establishes the doctrine that

neither the voluntary feature of the conveyance, when the same appears on theface of the instrument, nor the fact of indebtedness on the part of the grantor short of insolvency, unless accompanied by other suspicious circumstances of fraud, are sufficient to warrant the court in setting aside such conveyance as to subsequent creditors. (p. 287.)

*Okey Johnson, Mollohan & McClintic*, and *E. W. Wilson* for appellant, cited 10 W. Va. 87; 30 W. Va. 652; 10 W. Va. 321; 11 W. Va. 122; Code, c. 130, s. 22; 30 W. Va. 620; Id. 652.

*Payne & Green*, for appellees, cited 30 W. Va. 619; Id. 650; 10 W. Va. 87; 11 W. Va. 134; 2 S. E. Rep. 34, 35; 7 Gratt. 334, 337–339; Id. 340; 9 S. E. Rep. 508; 13 How. 93, 99; 20 Wall. 315; Bump Fraud. Conv. 280, 281, 282; Id. 285; 29 W. Va. 441, 450, 451; 32 W. Va. 507, 515, 518; 34 W. Va. 95, 101; 128 U. S. 134; 6 S. E. Rep. 129; 22 W. Va. 585; 17 W. Va. 770; Cowp. 711; 4 Dev. 201; 24 W. Va. 730; 25 W. Va. 830; 46 N. J. Eq. 90; 57 Ia. 516; 7 Gratt. 336; 39 Conn. 566; 2 Bail. 128; 34 N. Y. 508; 27 W. Va. 209.

LUCAS, PRESIDENT:

This suit was instituted by a bill in chancery filed by the plaintiffs in the Circuit Court of Kanawha county in the autumn of 1888. The plaintiffs charged in their bill that M. J. O'Brien had been a retail merchant in the City of Charleston for the past six or seven years; that on the 12th day of August, 1885, he purchased of one Mrs. Cecil a lot of land in said city at the price of nine hundred dollars, paying three hundred in cash, and giving joint notes of himself and wife for the remaining purchase-money, consisting of two notes of three hundred dollars each payable respectively on the 12th day of August, 1886 and the 12th of August, 1887; that the deed was made to P. F. O'Brien, wife of the purchaser; that the said M. J. O'Brien proceeded to put improvements, a dwelling, *etc.*, upon the lot, which the bill charges cost two thousand and five hundred dollars, but which were proved to have cost about one thousand and nine hundred dollars.

It is charged that M. J. O'Brien was much in debt at

the time of the purchase and the making of the improvements, and the paying of the deferred instalments; that the greater part of the money used for said payment was taken from his business and rendered him unable to pay his debts; that in 1888 he failed in business and made an assignment for the benefit of his creditors and has since been totally insolvent; that the conveyance to his wife and the withdrawal of the money from his business to pay for the lot and improvements were made with the intention on his part to delay, hinder and defraud his creditors; that he also withdrew from his business about one hundred dollars a year to pay premiums on a life insurance for the benefit of his wife; and that all such investments were made in contemplation of insolvency.

The prayer of the bill was that the claims of the plaintiff should be decreed to be charges on said house and lot, and that said deed should be declared fraudulent as to the plaintiffs, and for proper and general relief.

O'Brien and wife, as also Mrs. Cecil, answered the bill. The last named stated the fact that a part of the last instalment was still due, but that she did not desire the lien which she had reserved to be at present enforced. O'Brien and wife denied substantially all the averments of the bill, except as to the amounts of the several debts claimed in the bill and petitions. They called in question the correctness of only one debt, that of P. F. Duffy, and only contested that as to the correctness of the amount claimed. M. J. O'Brien admits in the answer that he had bought the property, and directed it to be conveyed to his wife. He denies the fact of indebtedness when the purchase and improvements were made, and specifically denies the intent to delay, hinder or defraud; alleges that he had ample means to pay all existing debts over and above the outlay; that his business was prosper- and he had every reason to believe he could give his wife a house and lot without injury to his creditors. He denies that a single one of the debts mentioned in the bill existed at the date of the deed, or when the improvements were put on the lot and paid for. He says, that over and above his liabilities, and after the cash payment on the lot and improvements there was more than ample left to pay his debts.

Depositions were taken on both sides, and sundry exhibits were filed.

On the 2d day of July, 1890, a decree was rendered by the Circuit Court setting aside the deed as fraudulent, and subjecting the property to the payment of the debts of complainants and petitioners in due order of priority and appointing a special commissioner to sell the land unless redeemed in thirty days. From this decree O'Brien and wife have taken this appeal,

In the case of *Pennybaker* v. *Laidley*, 33 W. Va. 624 (11 S. E. Rep. 39) it is said in the opinion of the court (page 635 :) "The rule is that he who alleges fraud must prove it. The supposed exceptions to this rule are more apparent than real. There may be *prima facie* fraud, or the evidence may be circumstantial. *Goshorn* v. *Snodgrass*, 17 W. Va. 717. Nevertheless, so long as the scales are evenly balanced, the defendant against whom fraud is alleged must prevail. *Harden* v. *Wagner*, 22 W. Va. 356, syllabus p'ts 9 and 10; Bigelow, Fraud, 127, 128."

With this rule in view, the decision in the present case is not difficult, nor the conclusion reached doubtful.

In the leading case of *Hunters* v. *Waite*, 3 Gratt. 26, the discordant opinions which had so long prevailed, both at the bar and on the bench of Virginia, reached a crisis, and what we may be perhaps pardoned for calling a contest of giants, in the judicial arena, came off between Judge BALDWIN and Judge STANARD. The point at issue was first whether a voluntary conveyance was absolutely void as to existing creditors, or whether this was merely a *primu facie* presumption, which might be rebutted by the introduction of competent and sufficient evidence; and, *secondly*, whether subsequent creditors did or did not stand upon an entirely different footing, in such manner that the voluntary deed was entirely good as to them, unless they could prove by proper and sufficient evidence actual fraudulent intent, on the part of the grantor.

This discussion, which occurred in 1846, drew public attention to the importance of the question, and to the fact that most eminent legal luminaries were arrayed against each other. Upon one side were, MARSHALL (apparently).

Story, and Baldwin, while upon the other were Kent, Washington, and Stanard.

In 1849 the legislature of Virginia came to the rescue, and passed an act which is, in substance, the same as that in our own Code upon the same subject. It was doubtless intended to solve the problem in favor both of the opinion and the reasoning of Judge Stanard in the leading case above cited. It is but a fair inference that the legislature, in adopting the conclusion of Judge Stanard, meant likewise to adopt or approve the reasoning on which that conclusion was logically based. In that opinion Judge Stanard thus explains the contrariety of view then prevailing, and the convenience of substituting a definite and invariable rule, which should draw a wide line of demarkation between existing and subsequent creditors. Among other things, he says:

"I have already alluded to the doctrine, at times advanced in the progress of the controversy involving the respective right, of creditors of the grantor and volunteers claiming under the debtor, that if the conveyance was void as to prior, it was necessarily so as to subsequent, creditors. I can not but believe that the assumption that such is the established doctrine, and that the necessary consequence of upholding the rights of prior, would be to expose the voluntary settlement to the claims of subsequent creditors, and thus leave every settlement, however fair and honest the intent, if the grantor was indebted at the time of the settlement, exposed to the future discretion or indiscretion and improvidence of the grantor, had great force with those who have come to a judgment against the rights of prior creditors. If such were the consequence, I join in unqualified reprobation of the construction which involved that consequence. It is true that contemporaneous with the doctrine, that any amount of indebtedness brought the conveyance within the denunciation of the statute and exposed the subject conveyed to the claim of all creditors, the courts treated what was denominated a fraud in construction of law (which was but a mode of stating the subordination of the right of the donee to that of the creditor) as equivalent to actual fraud. But the whole course of

subsequent decisions rejects the doctrine. They admit the distinction between prior and subsequent creditors; and that distinction on the plainest principle involved the consequence, that a prior creditor may have the right to charge the property embraced by the settlement, when the subsequent creditor has not. What incongruity is there in this distinction between the rights of these classes of creditors? Such a distinction is an elementary principle of the common as it is of the civil law. Does not the contemporary existence in the courts of Westminster of the doctrine, that the prior creditor had a right to charge the donation without regard to the amount of debt or the circumstances of the grantor, and that the subsequent creditor's claim to impeach it may be repelled on evidence and can not be sustained except by direct proof or fair legal implication, having regard to the circumstances of the grantor, of the fact that the settlement was as to the grantor *mala fide*, show that there is no such incongruity? On the claim of the subsequent creditor, the state of indebtedness at the time of the conveyance is now but a circumstance to be weighed with others in determining the *bona* or *mala fides* in fact of the conveyance."

The legislature, as we have said, adopted this view of the law, and relieved the question of all further uncertainty by inserting into the act the well-known second section, as follows :

"Every gift, conveyance, assignment, transfer, or charge, which is not upon consideration deemed valuable in law, shall be void, as to creditors whose debts shall have been contracted at the time it was made, but shall not, on that account merely, be void as to creditors whose debts shall have been contracted or as to purchasers who shall have purchased after it was made; and though it be decreed to be void as to a prior creditor, because voluntary, it shall not for that cause be decreed to be void as to subsequent creditors or purchasers." Code (1891) c. 74, s 2, p. 649.

In the application of this act to voluntary conveyances, made since its passage, the act itself should be regarded as embraced in the voluntary settlement. By thus construing such instruments, viz., that all existing debts are recognized

as liens upon the property superior to the donee in equity and priority, much of the ancient learning about conclusive presumption of fraud, and much of the inquiry formerly required to ascertain a man's financial standing with reference to his position in life, and his financial capacity to make reasonable advancements, ought to be regarded as cut up by the roots. The section should receive a plain, common-sense, remedial construction, and not be frittered away by resorting to the refinements and complicated and almost indeterminable questions of evidence which formerly embarrassed the court, but which the statute was intended, as we have said, to cut up by the roots.

For example, does the statute recognize the power of the courts to "substitute" subsequent creditors to the shoes of prior creditors? It contains not a syllable on this subject, and were we to attempt to exercise any such power, and undertake thus to confound the two classes, which the act has made absolutely distinct, it would be on our part clearly the assumption of judicial legislation. Prior creditors are not prejudiced by a settlement known and acknowledged to be voluntary, for the reason that such a settlement is entirely abortive to withdraw the property from their debts. Such deed is void as to them, as Judge STANARD explains, not because it is fraudulent, but because it is voluntary.

In ordinary cases, therefore, the Circuit Court has only to ascertain what debts existed when the deed was made, and to declare it as to them void, and as to all subsequent creditors valid; and, if the latter desire to attack the deed, the burden is on them to prove an actual fraudulent intent attaching to its inception and execution. This burden is not met nor even appreciably relieved by the voluntary feature, the statute expressly declaring otherwise; neither does the ancient vexatious questions as to whether the advancement was reasonable, as compared with the donor's means and condition of life, have any appreciable value, because the *status* of prior creditors is already impregnably guarded by the statute; and hence the question is, as to them, immaterial, and it is equally immaterial as to subsequent creditors, because the statute has expressly withdrawn the property from their reach.

These circumstances, which in the different view of the law formerly prevailing were of such importance, have ceased to have any material weight until the subsequent creditor has connected them as links in a chain with some covinous device or appearance indicating actual fraud; such as representing or reciting that the deed is on valuable considerations, when in fact it is voluntary; or suddenly and secretly, on the part of the grantor, divesting himself of title to valuable property, while he remains in possession as before; or suddenly and out of the usual course of business making heavy loans or contracting large debts; or removing from the State; or again selling the property after the voluntary conveyance. These illustrations furnish the character of proof which must accompany the voluntary feature before such circumstances should have any weight in making out a case of actual fraudulent intent.

These principles are, as I believe, in the main sustained by the decisions of our own Court, although, perhaps, we have not at all times as clearly emphasized them as might have been done—a failure which perhaps may be attributed to laying too much stress upon those discussions antecedent to the date of our own act, involving principles and considerations now fortunately more or less obsolete.

In the leading case of *Lockhard* v. *Beckley*, 10 W. Va. 87, the principles to which I have adverted were laid down as follows: "(4) A voluntary conveyance, which interferes with or breaks in upon the rights of existing creditors, will not be permitted to take effect to the prejudice of their just demands, but, as to such creditors, is absolutely void without regard to the amount of the debts, the extent of the property so conveyed, the motives which prompted the settlement of the conditions, or circumstances of the party at the time. (5) The second section of chapter 74, Code W. Va., makes a clear distinction between the rights of existing and subsequent creditors as to a voluntary conveyance, and such a conveyance can not be impeached by subsequent creditors on the mere ground of its being voluntary, and the party making it, or at whose instance it was made, being indebted to some extent, if there be no actual fraudulent view or intent in the party at the time. (6) But if it

be shown that there was *mala fides* or fraud in fact in the transaction, whether the actual fraudulent intent relates to existing creditors, or is directed exclusively against subsequent creditors, the effect is precisely the same, and subsequent creditors may, upon the strength of such fraud, successfully impeach the conveyance. (7) While it is true, under the second section of chapter 74 of the Code of West Virginia, a voluntary conveyance as to subsequent creditors is not void merely on the ground that it was voluntary, and the party indebted at the time it was made, yet, upon the question whether it is fraudulent in fact, it is proper to consider the circumstances of its being voluntary and the party indebted at the time ; *and, if additional circumstances connected with these two be sufficient to show fraud in fact, it is void as to subsequent creditors.*" (Our italics.)

It is hardly necessary to add that the sentence last quoted requires that such additional circumstances, beyond the mere voluntary feature of the deed and the indebtedness of the grantor, should be proved by subsequent creditors before they can set aside the deed. This syllabus was set out in the opinion in *Rogers* v. *Verlander*, 30 W. Va. 651 (5 S. E. Rep. 847). Nevertheless, in the syllabus of the last-named case, a proposition apparently inconsistent with point 7 of *Lockhard* v. *Beckley* is laid down. Point 4 of *Rogers* v. *Verlander*, p. 620 (5 S. E. Rep. 847) is as follows :

"A person largely indebted, and owning no personal property, gives away more than two thirds in value of his real estate, executing a voluntary deed to the grantee, leaving in the grantor real estate which is estimated to be worth very little more than the amount of his existing debts; thus imposing on the creditors the risk of losing a portion of their debts should such real estate sell for a little less than its estimated value. Such deeds should be held to have been executed with an actual fraudulent intent to hinder, delay, and defraud his existing creditors ; and therefore subsequent creditors of such grantor may have such deeds set aside as to them as actually fraudulent, and not simply voluntary. Under such circumstances the grantor, if he would make his voluntary deed valid against his subsequent creditors, must retain property amply sufficient to pay all his existing debts."

This proposition must be taken in connection with the facts of the case itself, as set out in the opinion, which disclose that the deed assailed purported to be for valuable consideration, and was not on its face a voluntary conveyance; thus obviously indicating on the part of the grantor an intent to withdraw from the reach of existing creditors all the property so conveyed. As applied to the case then in hand, therefore, the proposition is correct, because the misrepresentation on the face of the deed supplied that "additional circumstance" of covin which, as we have seen, was insisted upon in *Lockhard* v. *Beckley, supra,* in which it was held that mere indebtedness at the time of making a deed voluntary on its face is not a circumstance to impeach the deed, except when accompanied by other badges of fraud.

As was observed in *Dance* v. *Seaman*, 11 Gratt. 778, 782, it is not the fact that creditors may be delayed that is sufficient to avoid a deed, but it is the intent to delay. If no such intent can fairly be attributed or inferred, the deed is valid. So in the case of *Hunter's Ex'r* v. *Hunter*, 10 W. Va. 321, the "additional circumstance" surrounding the transaction was that the owner in occupation of valuable real estate divested himself of the same by a secret conveyance, which was never admitted to record during his life, nor until eight years after its execution. So, also, in *Core* v. *Cunningham*, 27 W. Va. 206, the wife pretended to buy the property out of her separate estate, and the deed was concealed and never recorded. So, in *Mayhew* v. *Clark*, 33 W. Va. 387 (10 S. E. Rep. 785) the deed on its face purported to be for a valuable consideration, and the question at issue was to determine whether the wife had given a valuable consideration which conduced to the conveyance. The additional facts proved, moreover, a circuitous and evidently covinous series of transfers of the husband's property to the wife's brother, and from him to his wife's cousin, and thence to the wife herself.

I think we may safely say, therefore, that the true rule of West Virginia, as established by this court, is one which preserves the full remedial value intended by section 2 of our act in regard to fraudulent and voluntary conveyances,

and establishes the doctrine that neither the voluntary feature of the conveyance, when the same appears on the face of the instrument, nor the fact of indebtedness on the part of the grantor, unless accompanied by other suspicious circumstances of fraud, are sufficient to warrant the court in setting aside such conveyance as to subsequent creditors.

We have only now to apply these principles to the facts of this case. In the first place it is admitted, that none of these claims existed as debts on the 12th of August, 1885, when the deed was executed; nor did any of them exist until long after the improvements were put upon the property. The first installment of purchase-money, a note of three hundred dollars, fell due the 12th of August, 1886, and was paid about the time of its maturity by the husband. None of the debts claimed in these proceedings existed at that date, except a portion of the debt due to P. F. Duffy. The last installment of purchase-money fell due the 12th of August, 1887, but it has not been paid, though two payments have been made upon it, as follows: Interest in full, August 16, 1887; fifty dollars, June 28, 1888; and twenty five dollars, August 7, 1888.

It would appear, therefore, that all of these creditors are creditors whose debts were contracted subsequently to the date of the conveyance of and improvements upon the property; that only two of these creditors were such when the deferred payments on the purchase-money were paid by the husband, so far as paid at all. I find nothing in the case to withdraw it from the general rule that the Circuit Court should have instituted an inquiry and separated the debts into two classes, one of prior creditors and the other embracing subsequent creditors, and should have held the house and lot liable for such debts as existed, when the deferred purchase-money was paid by M. J. O'Brien to the extent of such payment, on the deferred purchase-money, and should have exonerated the property from all further liability to creditors. Of course, the first lien on the property is the balance of purchase-money due Mrs. Cecil, which is not disputed.

Let us now proceed to apply these principles to the facts developed by the evidence in this case. Much of the evidence relates to matters which prove to be irrelevant, be-

cause not connected with any main facts tending to prove an actual fraudulent intent on the part of the donor. For example, a man may not have the highest financial standing or even a good fiinancial standing among lawyers and bankers, and yet this fact would have no bearing upon and no tendency to prove a fraudulent intent. He may be indebted, yet this fact standing alone, as we have seen, has little or no weight. He may also in casual conversation speak of property donated to his wife as his own, but unless such declarations were a part of the *res gestæ* or were made with intent to deceive creditors, they amount to little or nothing, and in fact are inadmissible according to our decision in *Casto* v. *Fry*, 33 W. Va. 449 (10 S. E. Rep. 799).

Upon the other hand, it appears by very distinctly preponderating evidence that the donor, at .the time of the settlement, and putting the improvements on the lot, was not indebted to insolvency; that he made no concealment whatever, but had the deed promptly recorded in the name of his wife; that he made no false pretenses of any character whatever; that he contracted no sudden debts, but only such as would appear to be reasonable in the usual course of his business; that he divested himself of no property theretofore in his possession, except in the usual course of business; that he did not become insolvent until nearly three years after the date of the deed and the making of the improvements; and that the cause of insolvency, whatever it may have been, was not premeditated, so far as the evidence indicates or tends to show.

All the debts which existed when the lot was bought and the improvements put upon it have been since paid, and that before the institution of this suit. The very fact of the payment of prior debts, as was remarked in the case of *Bank* v. *Patton*, 1 Rob. (Va.) 536, repels the presumption of fraud as to prior creditors, because it shows that the grantor was not insolvent, and, *secondly*, that he intended no fraud against creditors whom he has thus faithfully paid. For these reasons, therefore, we are driven to the conclusion that the plaintiffs and petitioners have not succeeded in proving any actual fraud on the part of M. J. O'Brien.

Some of these complainants, however, were creditors at the time when the first deferred payment was made by O'Brien, on the lot on the 12th of August, 1886. By examining the testimony of P. F. Duffy, with his allegations in the bill and exhibits, we find that O'Brien was indebted to him in the sum of one hundred and two dollars and thirty four cents, with a small amount of interest, on or before the 12th of August, 1886 ; also the additional sum of ninety dollars contracted the 23d of June, 1887, which was prior to the payment of thirty six dollars interest by O'Brien on the 16th day of August, 1887; also that the payment by O'Brien of fifty dollars, on the 28th day of June, 1888, and twenty five dollars on the 7th day of August, 1888, were subsequent, not only to the debt of Duffy, but to that of Greer & Laing and McMann & Porter, and the Thomas debt and the Camp debt, and the Anderson Bros., *etc.* The principle being once ascertained that these payments of purchase-money, being voluntary, must be subordinated to the debts which existed when they were made, the application will be easily made from the record as it now stands, and no other evidence should be allowed or taken.

The decree of the Circuit Court complained of, therefore, is erroneous and must be reversed, and the cause is remanded to the Circuit Court to be proceeded in according to the principles of this opinion, and otherwise according to the principles of equity.

REVERSED.   REMANDED.