# CHARLESTON.

## WOOD *et al.* *v.* HARMISON *et al.*

Submitted June 24, 1895—Decided Nov. 30, 1895.

1. INTERLOCUTORY DECREE—APPEAL.

    An interlocutory decree that is appealable as one adjudicating the principles of the cause is one which adjudicates, not some, but all the questions raised in the pleadings or otherwise, and so far adjudicates that it determines the principles and rules by which relief is to be administered to the parties, so that it is only necessary to apply such principles and rules to the facts in order to decree the relative rights of the parties in the subject-matter of the suit.

2. FRAUDULENT CONVEYANCE—HUSBAND AND WIFE—FAIR CONSIDERATION.

    Where a conveyance is made from husband to wife, and it is attacked by his creditors as fraudulent, the burden is on her to show that she paid a fair consideration out of her separate estate; and, having shown this, the burden then rests on the creditors to show fraud, but it requires less evidence to show it than if the transaction were between strangers.

3. FRAUDULENT CONVEYANCE—HUSBAND AND WIFE—PURCHASER FOR VALUE.

    A husband transfers to his wife, owning separate estate, real estate charged with liens, in consideration that she pay the liens, and she acts in entirely good faith, and free of fraudulent design as to his creditors, and without notice of fraudulent intent on his part. She is a purchaser for valuable consideration, without notice, and as such protected against his creditors by section 1, chapter 74, Code. Owing to their relations, such transaction must be scanned closely, and it must appear clearly that she is free from fraud, and that any payments made under the transfer on liens were not from the estate of the husband.

4. FRAUDULENT CONVEYANCE—INADEQUACY OF PRICE.

    Where fraudulent intent against creditors is sought to be made out against a transfer of his property by a debtor on the sole ground of inadequacy, without any other element tending to show fraud, the inadequacy must be so great as fairly to induce the belief of fraudulent intent.

J. G. McCLUER for appellant, cited 67 Ind. 560; 28 La. Ann. 454; 31 Mo. 62; 1 Conn. 525; 52 Conn. 512; 101 U. S.

225; 3 John's C. H. (N. Y.) 501; 11 Mass. 421; 52 Ill. 18 6
8 Wheaton (U. S.) 229; 11 Wheaton (U. S.) 199; 26 Gratt.
354; 27 W. Va. 677; 29 Gratt. 628; 56 Ia. 366; 60 Ga. 82;
87 Pa. St. 510; 36 Kan. 610; 122 U. S. 496; 31 Fed. Rep.
588; 34 Kan. 32; 72 Ga. 101; 29 Gratt. 628; 28 Gratt. 49; 38
Ohio, 406; 97 Ill. 93; 29 Ill. 444; 31 Ark. 554; Am. & Eng.
Enc. of Law, Vol. 8, p. 656, § 6, 7; Warvelle on Vendors,
Vol. 2, p. 618, § 16; 4 Rand. 282; 3 Gratt. 68; 14 W. Va.
66, 3d syl.; 93 N. Y. 124; Cowp. R. 432; 10 W. Va. 87;
Wait on Fraudulent Conveyances, § 369; 19 N. Y. 417; 17
W. Va. 718, p'ts 7, 8, syl.; 29 Ill. 444; 5 Me. 471; 22 S. C. 512;
24 Kan. 780; 22 W. Va. 356; 8 Wheat. (U. S.) 229; 8 Wall.
(U. S.) 370; 7 Allen (Mass.) 146; 3 Wash. 546; 14 Me. 370;
3 Grant. (Pa.) 237; 11 Gratt. 477; 3 Dana (Ky.) 439; 91 U.
S. 485; 29 W. Va. 521; 39 N. Y. 317; 29 Gratt. 628, 629;
Phillips, Ev. 425, 625; 8 Term Rep. 474; 3 S. & R. 355; 4
Dal. 152; 11 Pet. 199; 2 Lomax, 441; 29 W. Va. 453; 39 W.
Va. 325; 2 Russ. 170; Wm's Exr's (7 Eng. Ed.) 1794; 6 Sims,
504; 20 Deav. (Eng.) 356, 365, 366; 12 Phila. (Pa.) 88; 1
Den. (N. Y.) 547.

MERRICK & SMITH for appellees:

*The decree of Dec. 4, 1894, does not adjudicate all the questions
arising in the cause. It is not appealable.*—27 W. Va 215;
29 W. Va. 131.

*Creditors should sue.*—72 Am. Dec. 203; 62 Am. Dec. 545;
64 Am. Dec. 169-175; 8 Am. & Eng. Enc. Law, 774.

*When suit may be brought.*—39 W. Va. 320.

*The administrators are proper parties.*—15 W. Va. 344.

*Mrs. Harmison is not a competent witness in this case.*—Code,
c. 130, s. 23; 14 W. Va. 88; 25 W. Va. 587; 32 W. Va.
20.

*Mayberry's opinion about the assets made out from sale book
not competent evidence.*—21 W. Va. 301; 37 W. Va. 404-
5; 1 Greenl. Ev. §§ 117, 118, 82, 91.

*A person largely indebted makes a voluntary deed for all his real
estate leaving an insufficient amount to pay his debts, thus
imposing on his creditors the risk of losing their debts. Such
deed will be held to have been executed with an actual fraud-
ulent intent and both existing and subsequent creditors may*

*have it set aside as fraudulent.*—30 W. Va. 620, 647, 650, 655; 10 W. Va. 87, 111, 112; 30 W. Va. 598-9; 29 W. Va. 395; 22 W. Va. 586, 594.

*No resulting trust to the wife for money advanced to husband.*— 13 W. Va. 55; 24 W. Va. 410; 29 W. Va. 452; 32 W. Va. 14, 210, 451.

*A transfer from husband to wife is open to suspicion.*—29 W. Va. 453.

*The burden is upon the wife to establish her right as against creditors.*—11 W. Va. 122; 22 W. Va. 673; 23 W. Va. 499; 24 W. Va. 203; 27 W. Va. 206; 29 W. Va. 453; 39 W. Va. 325.

*Mrs. Harmison assented to the purchase of new goods, after her husband's death knowing that the proceeds would go into her pocket. She is personally liable.*—7 Am. & Eng. Enc. Law, 342 and note 1; 23 Ohio St. 231; 11 Ser. & R. (Pa.) 41; 83 N. C. 90; 3 S. E. Rep. 160 (Ga ); 2 So. Rep. 501; 8 Conn. 587; 20 N. Y. 437; 11 La. An. 472.

BRANNON, JUDGE:

The bill in this case exhibited in the Circuit Court of Cabell county by Wood, Brown & Co. and other firms against Emma L. Harmison and others, alleged among other things, that the firm of Harmison & Hill was indebted to the plaintiffs; that Harmison & Hill had been composed of Frank J. Harmison, deceased, and A. E. Hill, deceased; that Frank J. Harmison by his will gave all his property to his widow, Emma L. Harmison; that when Harmison died the business of the firm of Harmison & Hill was going on under the control of A. E. Hill, as manager, and the business was, by permission of Mrs. Harmison, continued for some time after Harmison's death; that the goods sold by the plaintiffs to Harmison & Hill before Harmison's death were sold on the credit of the firm as then constituted, and those sold after his death were sold under the faith inspired by certain statements of Hill that Mrs. Harmison, who had large means, was then a partner, and that she was in fact such partner; that Hill had since died, leaving no estate, and that, as claimed by Mrs. Harmison, her husband left no estate at his death; that Harmison, in

life, purchased valuable real estate, and paid large sums thereon, and had conveyed it to his wife, Emma L. Harmison, subject to some unpaid purchase money due from Harmison; that when he so conveyed said real estate to his wife, said Frank J. Harmison was insane, and incapable of executing such conveyances, and that she had procured such conveyances by taking advantage of his condition, and that the conveyances were void as to said creditors for that reason, and also because without valuable consideration, and taken by her with intent to hinder, delay, and defraud creditors, and that the real estate was liable to their debts; that there were some assets in the hands of Hill's administrator, as representative of a surviving partner, arising from assets of the firm of Harmison & Hill. And the prayer of the bill was that the plaintiffs' debts be decreed them, that Emma L. Harmison be decreed liable therefor, that the accounts of the administrators of Harmison and of Hill be settled, that the real estate conveyed by Harmison to his wife be charged with the debts, and the conveyances to her held void and annulled as to them, and for general relief.

A decree was pronounced which declares fraudulent and void the transfers of real estate of Frank J. Harmison to his wife, to the extent of certain sums which he had paid in the purchase of the estate, so far as the transfer affected debts of the firm of Harmison & Hill incurred in the lifetime of Frank J. Harmison; and the decree declares that the creditors, to that extent, have right to charge the property in Emma L. Harmison's hands. The decree absolves her from personal liability for debts contracted by Hill, the surviving partner of Harmison & Hill, after Harmison's death. The decree then declares that in order to make a final decree, a reference was necessary, and it referred the case to a commissioner to ascertain and report what debts Frank J. Harmison owed, and what debts Harmison & Hill owed, at the dates of the conveyances by Harmison to his wife; what portion of the debts yet remained unpaid, what portions of the debts existed when Harmison died, and what portion had been incurred since his death; what liens for purchase money yet remained on the said realty—and to settle the accounts of A. E. Hill, administrator.

As a prerequisite to the decision of the matters brought before us for decision, we must determine whether we have jurisdiction to decide them, as this question is raised. Is the decree appealed from such a decree as will warrant an appeal? At one time in Virginia only a final decree would support an appeal. To this rule there were objections. It was difficult to say what were final decrees. And further why, after a decree settling the real principles of the case, leaving nothing to be done but to execute it, let it go on, at cost of time and money, and, after all was done, reverse all? Would it not be better to at once test that decree by appeal? But it would not do to allow an appeal from any decree or order just because it settled something in the case, though important, leaving important subjects yet untouched; for that would greatly delay the lower court, by repeated appeals, and fill the appellate court with innumerable appeals. In the Code of 1849, and by prior legislation, the field of appeals was considerably enlarged by allowing them to certain decrees and orders, not final, but interlocutory in character, mentioning certain specific ones, and adding any decree or order "adjudicating the principles of the cause." Our Code, in chapter 135, section 1, has enlarged upon the Virginia Code, and continued the appealability of "decree or order adjudicating the principles of the cause." No provision in that statute will sustain this appeal, unless the decree be one adjudicating the principles of the cause, within the true meaning of that provision. Not every decree that adjudicates principles of the cause is ground for appeal. It might warrant one as falling under some specified character giving a right of appeal, as, for instance, that it dissolved or refused to dissolve an injunction, or required money to be paid, or the possession or title of property to be changed, or real estate to be sold; but if coming under no other head, and seeking shelter under the clause quoted, it must still have a certain character, as adjudicating the principles of the cause—not part of them, but all of them, as it was not intended that a dozen decrees, disposing of the matters in controversy by piecemeal, should each be appealed. In *Shirey* v. *Musgrave* 29 W. Va. 131 (11 S. E. 914) it was held that this statute

authorizes an appeal under this clause only when the decree adjudicates all questions raised in the cause by pleading or otherwise, and that, if any one of a number of questions involved is left undetermined, it is not appealable. That case does not settle this case, however. It was not appealable because it left some questions undisposed of, while in this case the question is whether, though the decree does pass on all the questions in controversy, does it so far pass upon them as to enable us to say that it adjudicates the principles of the case? This decree ascertains no certain debts, decrees none against the property, sells no property, settles no accounts of administrators, but leaves those matters for the future, upon the return of the commissioner's report. Clearly, that deprives it of the character of a final decree; but does it still sufficiently decide the principles involved in the case to call for an appeal? I think it does, because it holds the conveyance to Mrs. Harmison from her husband void as to creditors with debts established by the record, and holds the land liable in her hands to their payment. The cardinal questions in the suit are whether the deeds are void as to certain debts, and the land liable therefor, and whether Mrs. Harmison is personally liable, and they are adjudicated, and all other matters are but subsidiary or sequential to those matters. It only remains to apply the principles so adjudicated, and the case is ended. The decree lays out the way for further adjudication. Upon the same clause we have Virginia cases which sustain this view. *Reed* v. *Cline's Heirs*, 9 Gratt. 136, was a suit to enforce specific execution of a title bond for the sale of land, and the statute of limitations was pleaded, and the circuit court only directed an issue to try whether the title bond had been executed, and assigned and lost; thus impliedly deciding that, if it had been so executed and assigned, the plaintiff was entitled to relief over the statute of limitations. Held an appealable case, though it only impliedly decided the principles of the case, and gave no decree of performance. In *Garrett's Adm'x.* v. *Bradford*, 28 Gratt. 609, it is held that a decree which overrules exceptions to a commissioner's report, and confirms the report as to questions involved in the exceptions, is a

decree settling the principles of the cause, as to them, so as to sustain an appeal, though the report be recommitted as to other matters. *Jameson* v. *Jameson's Adm'x*, 86 Va. 51 (9 S. E. 480) holds that a decree that adjudicates the principles of a case is appealable, though leaving something yet to be done by the court. In *Lancaster* v. *Lancaster*, 86 Va. 201 (9 S. E. 988) the rule is stated—and it fits this case—that an order adjudicating the principles of a cause is one which so far determines the rules or methods by which the rights of the partners are to be worked out finally that it is only necessary to apply these rules or methods to the facts, in order to ascertain the relative rights of the parties with regard to the subject-matter of the suit. I think the Virginia cases hold that, if a decree only adjudicate one of the questions, that is enough. I prefer the rule of *Shirey* v. *Musgrave*, because it prevents repeated appeals from interlocutory decrees. It will be understood that what is said on this subject above relates to chancery proceedings, not to those at law.

I now come to the merits. Are the two conveyances from Harmison to his wife fraudulent as to the creditors of the firm of Harmison & Hill, who assault them, and seek on that ground to sell the land for their debts? By one of these conveyances, dated March 20, 1893, Harmison conveyed to his wife various lots in Huntington and Central City. All these lots, except three of small value, as compared with others, were under purchase-money liens, which the deed required Mrs. Harmison to pay. By the other of said conveyances, Harmison on 17th April, 1893, assigned to his wife all his right to two lots in Huntington which he had purchased at a judicial sale, and on which rested an unpaid balance of over one thousand one hundred dollars purchase money, which this conveyance required the wife to pay, and then obtain a deed from the commissioner of the court.

The evidence shows that Mrs. Harmison owned a very considerable (in fact, a large) separate estate in Maryland, derived from her father and brother; that Harmison had been an active, sober, capable business man, engaged some time back in mercantile business at several points; that he

owed no individual debts, save those for said property, at
the date of these conveyances, and had been thought to be
well off—in fact, a man of large business and means; that
he was a member of the firm of Harmison & Hill, carrying
on a large store at Parkersburg, managed by Hill, while
Harmison took no active part in it, but resided in Balti-
more, engrossed in business transactions there and at other
points, and trusting the management and control of the
business of Harmison & Hill to Hill, and that to all outward
appearances that firm was doing a large business and was
prosperous—the wholesalers ever ready to sell to it. But
after Harmison's death some indebtedness was disclosed,
and when, in November, 1893, Mrs. Harmison, who was
the Maryland executrix of her husband, and the sole devi-
see and legatee under his will, went to Parkersburg, with
her brother-in-law, to look into the business of the firm in
the hands of Hill, the surviving partner, it was found great-
ly embarrassed, owing upward of sixteen thousand dollars,
and the assets ten thousand, one hundred and one dollars
and sixty cents for stock and fixtures, sixty one dollars and
eighty five cents cash, and six hundred and sixty five dol-
lars and twenty nine cents bills receivable—total, ten thous-
and, eight hundred and twenty eight dollars and seventy
four cents. But it is of import to know what was the
financial condition of the firm when the conveyances were
made to Mrs. Harmison, in March and April, 1893, for we
want to know whether she had knowledge then of an in-
debtedness of that firm. She did not know of any indebt-
edness of her husband individually, save what he owed for
his unfortunate, improvident purchases of the properties in
Huntington and Central City; for no such debts appear,
save those, and it is shown there were none. But, I re-
peat, it is important to know whether she was aware of a
large indebtedness of her husband as one of the partners in
the firm of Harmison & Hill, because this enters materially
into the question of her good faith in taking these convey-
ances from her husband; for if she got this property from
her husband in consideration of her relieving him from
large personal indebtedness, and the property from liens
which would engulf it, and honestly believed it would leave

no creditor unpaid, she would stand as a *bona fide* purchaser, untainted of fraud; whereas, if she then knew that her husband was under heavy liability for debts of Harmison & Hill, she might not stand as a *bona fide* purchaser, untainted of fraud.   Then the pivotal question is, did she know it ? Was there anything to tell her of it ?   Here we first naturally ask what was then the condition of Harmison & Hill? We do not exactly—can not exactly—know.   We do know that when Harmison died, 25th June, 1893, his widow required the surviving partner to close up the business, and he spread broad cast circulars of a sacrifice sale to close up the business, and did sell the goods at reduced prices— greatly reduced prices—up to Hill's death, 6th November, 1893; the sales from 16th April to 25th of June being seven thousand, one hundred and fourteen dollars and forty five cents, and from 25th of June to 6th November, seven thousand, two hundred and sixty two dollars and eighty four cents, and very few goods bought after Harmison's death (only domestics, to help dispose of stock)—thus showing sales between 16th of April, the date of the last deed from Harmison to his wife, to 6th November (nearly all old stock) to the large sum of fourteen thousand, three hundred and seventy seven dollars and twenty nine cents, leaving it fair to say that at the date of that deed the assets were over liabilities.   Statements made up from the books by two clerks of the firm make the assets, 16th April, twenty six thousand, one hundred and seventy seven dollars and two cents—very largely over any pretended indebtedness at that date.   A hasty look at the accounts in this suit shows that they are about seven thousand dollars, and that of this about two thousand, seven hundred dollars was incurred after the date of that deed, and that at the date of the earlier deed, conveying the bulk of the property to Mrs. Harmison, not more than about one thousand two hundred dollars had been incurred.   Adding this one thousand two hundred dollars to two notes of four thousand dollars and five thousand dollars, later referred to—if both ought to be added—and, at most, we do not see more than ten thousand two hundred dollars indebtedness; and most certainly the assets were very decidedly more, even saying that the

counsel for plaintiffs is right when he claims that fifteen thousand dollars was the average stock on hand. Thus, this firm was not insolvent, but solvent, at the dates of these conveyances, though indebted; and this justifies us to say that it is probable Mrs. Harmison not only did not know of any insolvency which did not exist, nor of any indetedness of the firm, but had reason to suppose that all was well with the firm, and that it was able to take care of itself. It was then in the height of business and success, so far as any one but Hill could see. Why should Mrs. Harmison know to the reverse? She was hundreds of miles away. Indeed, did her husband know of any bad condition? Did any one but Hill? Harmison was far away, engaged in other fields, and trusted to his partner. If he did not know, surely his wife would not; and not likely so, even if he knew. It is thus not probable, from the condition and apparent thrift of the firm, that she knew of or suspected any of its indebtedness; and it is not proven she did, and she says on oath she did not, but regarded the firm prosperous. There was a note of four thousand dollars of the firm. What its date, we do not know. Mrs. Harmison indorsed it, at Hill's request, in July, and this is the first she knew of it. She paid it. There. was a note of five thousand dollars, but it is not shown whether it was the firm's or Harmison's. Likely it was Harmison's, as he provided for its payment, through his wife, out of coal stock. We do not know what this stock was worth. There is no definite showing about it. It cost the wife five thousand dollars. This much is sure. There is no showing that she knew of it earlier than 10th April, 1893. She indorsed it —when, we do not know; but she, in consideration of a transfer of coal-company stock (not involved in this suit, save so far as it may bear as evidence on the question of fraud) assumed to pay and did pay it, by two checks of April 10, 1893, and August 5, 1894, for two thousand dollars and three thousand dollars, which I understand went on this note. Of one of these notes she did not know till Hill revealed it to her after her husband's death, and she indorsed and paid it. That was long after the conveyances. If the other note was a firm note, and she knew of it before they were made,

she undertook its payment; and it has no force here to convict her of fraud, unless we shall say that it ought to have moved her to suspect other unpaid indebtedness; and this would be going far in the line of supposition and suspicion. Had she taken the deeds, leaving this note unprovided for, we might say it was strong against her; but, as she provided for it, it argues that she was acting honestly, assuming what indebtedness she knew of, and did not know of any more. She may have known of it, if there was any of an amount compared with the assets, and this does not appear; but, if she did know of it, it is not shown. We can not convict her of fraud, without evidence, though she be the debtor's widow. Fraud must be proven, and can not be presumed. At this point I ask, where is the evidence to fix fraud? That Mrs. Harmison paid valuable consideration for the conveyance is clear, because she assumed debts on the land then amounting to about ten thousand dollars. Of this large debt she has paid more than half, and can not help paying the balance. Though wife, she is entitled, in a court of justice, to hold the defense of a purchaser, unless fraud is fixed upon her. Were she without separate estate amounting to thousands of dollars, we might say her payment came from her husband, and her defense is fictitious; but this estate is most abundantly shown, and is not a question in the case, and her payments are shown by bank checks. If not proven guilty of fraud, equity ought not to cause her to lose what she paid, which she must do, if guilty, even if the court would prefer the purchase money not yet paid by her to the debts of creditors, if subjecting the land.

There is no evidence that Harmison intended fraud; much less any that the wife did. Both our Code and decisions say that, though the grantor designed fraud, yet if the grantee is a fair purchaser, in good faith, without notice of the grantor's fraudulent purpose, the purchaser's title can not be affected. *Goshorn* v. *Snodgrass*, 17 W. Va. 717. And a wife, if a fair, *bona fide* purchaser, comes under this rule. Bump, Fraud. Conv. 306; Wells, Mar. Wom. 151. Point 5, *Burt* v. *Timmons*, 29 W. Va. 441 (2 S. E. 780) admits this. If Harmison did know of any indebted-

ness of the firm, is it likely he would communicate it to
his wife? The probability is that he would not. If it be
said these parties are man and wife, and this shifts the
burden of proof on the wife, as in cases like *Burt* v. *Tim-
mons*, 29 W. Va. 441 (2 S. E. 780) the answer is that this
wife has proven, beyond even question, that she had separ-
ate estate, and actually paid, and has purged her conscience
of fraud on oath, and guilt is not proven on her. What
more can be demanded? To demand more, under the cir-
cumstances of this case, would demand impossibility.

There is a popular impression that a husband can not
convey to the wife. That is a mistake. At common-law
he could not, the deed being void, but in equity it was
good. Section 3, chapter 66, as last amended by chapter
3, Acts 1893, keeps up the common-law disability of the
wife to take from her husband by giving her capacity to
take property from any person other than her husband,
but this does not affect the validity of the deed in equity.
It is good between the parties there. *Humphrey* v. *Spencer*,
36 W. Va. 11 (14 S. E. 410). But, though good between
the parties, it may be void as to creditors. As to creditors,
it is a question of good or bad faith, fraud or honesty. If
it be a case of entirely good faith, based on a valuable con-
sideration paid by the separate estate of the wife, or some
other person than her husband, it is good. Owing to the
relation of the parties, a court will scan the transaction
with the utmost scrutiny, and require the wife to show the
valuable consideration, and that it came from her separate
estate, and not covertly from her husband. If these things
resting on her to show are shown, fraud must be shown by
the creditor, under the general rule; but, where the trans-
action bears on its face any suspicion or badge of fraud, it
raises a presumption of it, which she must meet by proof
of circumstances attesting good faith. *Hutchinson's Ex'x*
v. *Boltz*, 35 W. Va. 754 (14 S. E. 267). Point 6, *Livey* v.
*Winton*, 30 W. Va. 554 (4 S. E. 451) might seem to impose
on the wife the burden of showing also good faith, and not
on the creditor to show the lack of it. This may be the
safer rule, considering the relation of husband and wife.
It may be but the practical application of point 5 in that

case, and point 2 in *Burt* v. *Timmons*, 29 W. Va. 441 (2 S.
E. 780). But if we suppose that the wife has shown pay-
ment out of her separate estate of a fair consideration, is
that not logically enough to call for proof of that which is
a moral offense, and not presumed against any one—fraud?
When she has shown that, has she not shown good faith,
*prima facie*? When the transaction is between husband
and wife, it takes appreciably less evidence to establish
fraud than between strangers. *Livey* v. *Winton*, 30 W. Va.
554 (4 S. E. 451). This case is favorable to the wife, over
many past cases in this Court, in the fact that she paid
large sums out of a separate estate; and the case seems fair
on its face, without badge of fraud. She had no knowledge
of her husband's insolvency, if we can say he was insolvent;
for though, as it was revealed at his death for the first time
to even his wife, he had no substantial estate, yet he had
an interest in the large Parkersburg store. He was a man
of extensive business. True, his wife admits that he stated
to her in August that he needed some money to pay on the
Huntington purchase, as he had not realized some he ex-
pected; yet that is not uncommon, and she no doubt be-
lieved him then solvent. If she knew of embarrassment,
it was only of that arising from his Huntington purchases,
and this she assumed to pay.

I now reach another feature of the case. Harmison had
already paid on the property conveyed to his wife thirteen
thousand one hundred and eighty six dollars and sixteen
cents, and the creditors ask: "Shall his wife be allowed to
take the property by paying only the balance of purchase
money, only about ten thousand dollars, and we get noth-
ing—get nothing for the large sum which our debtor in-
vested in it? Is this justice to us?" These questions seem
grave, and hard to answer at first view, but there are
answers. We have shown that so far there is no evidence
of fraud in the wife, arising from a knowledge of indebted-
ness of her husband, either individually or as a partner.
If an honest purchaser, she can not be deprived of her de-
fense as such. We cannot say that, though free of fraud,
yet the large sum which her husband had paid on the
property was a gift, and is liable as a voluntary conveyance,

because it is not a voluntary conveyance, as she paid valuable consideration. But it is said the property's prime cost was twenty two thousand dollars, and she gets it for ten thousand dollars. That makes no difference, unless the price is so grossly inadequate as to warrant the presumption of fraudulent design, and half price has been held not gross. *Lallance* v. *Fisher*, 29 W. Va. 512 (2 S. E. 775). The same rule as to disparity between the price paid and the real value does not, it is true, prevail where the contest is between a creditor and an alleged fraudulent alienee, as between a vendor and vendee; but, when fraud is sought to be raised on inadequacy alone, it must be so great as to strike the understanding with the conviction that such a sale never could have been made in good faith. Bump, Fraud. Conv. 45. "The court has not been very particular," said Sir Thomas Plumer, "as to the sufficiency of the consideration, if the contract was *bona fide*"; that is, where there is no other indication of fraud than inadequacy. 2 Bigelow, Frauds, 500. Where are the other indications in this case? I think however, as a matter of law, that, where the contest is between the wife and creditors of her husband, there is stronger reason to demand fair full consideration than when the conveyance assailed is to a stranger.

Is the sum paid by Mrs. Harmison so inadequate as to justify the imputation of fraud? Let us refer to the facts. In August, 1892, Harmison's mind was very seriously affected. He was on the verge of insanity. He died of paresis June 25, 1893. In such condition of mind, in August, he went to Huntington and Central City, when property and speculation there were at the flood tide— when the "boom" was prevailing. He had been a man of business, active and zealous in the pursuit of wealth, and he was imbued with the belief that he could there soon make a fortune out of real estate. He fell in with a real-estate agent who cultivated his mania in this line. He bought various properties—bought recklessly and improvidently. He was so inspired with the spirit of speculation that he telegraphed his brother-in-law, a bank president of Washington, to come to join in the wealth making.

He purchased the Florentine Hotel at thirty thousand dollars and gave a check which was not honored; and his brother-in-law, seeing his mental condition, his utter incapacity in his unfortunate mental condition, and his improvidence and recklessness, induced the party who sold him the hotel to cancel the contract. But in other contracts he had already become bound, and had paid large sums on his purchases. A witness says he would have bought the whole of Huntington, if he could have gotten the money. All the while this real-estate agent plied him until he exclaimed, "These real-estate men have set me crazy!" Under their influence, especially a particular one, he purchased these properties at inflated, fictitious prices. That autumn prices declined, say some witnesses; and if, that autumn and winter and spring, there was not an actual decline in values of property, it was only because there was no sale for it, which is worse than depreciation, when, as in this case, it was the presage of that terrible panic which laid its weight of stagnation, depression, and disaster on the whole country. All the witnesses say that from early fall of 1892 there was no sale for property in Huntington and Central City. A boom raised there temporaily by a few real-estate agents from abroad, burst. All say this was followed from June, 1893, by actual great depreciation, and it continued when the evidence in this case was taken. When would it lift so that the property would bring more than Mrs. Harmison put in it, if we were to take it from her and sell it for creditors? If we were to say that what her husband put in it was a voluntary settlement upon her, and that that sum ought to go to creditors, and, treating her as not guilty of fraud, say that she and her husband having both contributed in the acquisition of the property, they should share ratably in its proceeds, it would not realize the shares of both, by a great deal; but we could not adopt this theory, because she, having lifted prior liens valid against creditors, if free of fraud, would have to be subrogated to them, and given a preference, which, upon the evidence, we may fairly say, would leave nothing for creditors. And to do that, even for creditors, we would have to find her guilty of fraudulent intent, and remove

her from the position of *bona fide* purchaser, which I think she is entitled to be considered, for reasons above stated. There is a difference among numerous witnesses as to the value of the property. Some think Harmison paid only the fair value then. Many think he paid fictitious prices, and that the burden Mrs. Harmison assumed when she took it off her husband's hands was its fair, full value What would it be worth to creditors now? All concur in a great decline. Knowing when it was, through what agency it was bought, the excitement then prevailing, and Harmison's aberration and frenzy of mind, it is only safe to say that the sums he paid were entirely unreal values. How much too high, we can but estimate. And just here remember that when dealing with a purchaser otherwise not chargeable with fraud than in small consideration, the law does not weigh the price in scales that weigh diamonds, because men differ in opinion in few matters more than values; and it will not convict the purchaser, on this ground, of fraud, unless the consideration be so grossly inadequate as to shock the moral conscience. We cannot say that such is the case here. And just in this connection, when we are inquiring whether Mrs. Harmison is guilty of fraud for having paid too little for her husband's property, we must not omit a fact in her favor—that she furnished her husband two thousand seven hundred and forty dollars that summer that went on the purchase money, besides the ten thousand dollars which she assumed when she received the conveyance from him. She swears it went on his purchases. We can not read her evidence of transactions and communications between her and her husband in a contest between her and her husband's creditors. *Smith* v. *Turley*, 32 W. Va. 14 (9 S. E. 46). But we do not need her evidence to prove that she furnished this money, or that it went into the property; for there is her check in his favor, deposited for collection in the Drovers' & Mechanics' National Bank, Baltimore, where he kept his account, and collected by it, dated 26th August, 1892, and there is his check four days after for seven thousand three hundred and sixty nine dollars and eighty two cents to attorneys having charge of the purchase money collection, and, thus

the conclusion is fair and reasonable that it went into this purchase. So it ought to be added to the ten thousand dollars she assumed when she took the deeds, in ascertaining what she really has paid for the property. She says this two thousand seven hundred and forty dollars was a loan. We could not take her evidence, under the law, to prove it a loan, under the authority just cited, because it is a personal transaction between her and her deceased husband; and as settled by repeated decisions of this and other courts, in a contest between the wife and the husband's creditors, where it is shown merely that she furnished her husband money, it is presumed to be a gift, not a loan, unless she clearly prove, by note or otherwise, a promise of repayment. *Bank* v. *Atkinson*, 32 W. Va. 203 (9 S. E. 175); *Zinn* v. *Law*, 32 W. Va. 447 (9 S. E. 871); *Bennett* v. *Bennett*, 37 W. Va. 396 (16 S. E. 638); *Miller* v. *Cox*, 38 W. Va. 747 (18 S. E. 960). But a competent witness says that when Mrs. Harmison advised with him about taking a deed for the property, while that transaction was going on, she stated that the two thousand seven hundred and forty dollars was a loan, which may be evidence of the loan, as part of the *res gestæ* of the later transaction. But that is not material. We know, outside of her evidence or declarations, that she furnished the money, and that it went on the purchase; and we can credit it to her, in considering whether she is guilty of fraud from inadequacy of consideration. More purchase money became due in early spring, 1893, and Harmison was pressed, and had nothing to pay with; for a few months later he died, utterly destitute of means, real or personal, except the firm store; and an uncertain interest in an estate on which a few hundred dollars has been realized, which Mrs. Harmison holds ready for creditors. His wife swears that he was greatly worried, and said he could pay no more, and would have to let the property be sold, unless she would take it and pay for it, and that after consulting friends, in order to try to save her two thousand seven hundred and forty dollars, she reluctantly concluded to do so, and not because she wished to make money. But we reject her evidence, for reasons stated. We know that purchase money was due; that he

almost surely had no money to meet it; that Mrs. Harmison consulted a brother-in-law, and hesitated about taking the property, telling him of her husband's inability to pay, and that she already had two thousand seven hundred and forty dollars of her money in it; and that her brother-in-law advised her to take the property, as the only means of saving that. This evidence of her declarations, evincing her motive and design in taking the property, seems admissible, under the principle of *res gestæ*, as a part of the transaction of these deeds, they having been made while the matter was in progress.

The deed of March 20, 1893, states that its consideration is five dollars and love and affection. It is said this is an estoppel upon the wife from showing other consideration. This is not law. The consideration may be shown. *Casto* v. *Fry*, 33 W. Va. 449 (10 S. E. 799). But there can not be anything in this, when this very deed shows that to be only a formal statement of the draftsman, as it provides that Mrs. Harmison shall pay the incumbrances. *Rogers* v. *Verlander*, 30 W. Va. 619 (5 S. E. 847) is relied on by appellees. It holds that if a person largely indebted, owning no personalty, gives away more than two-thirds of his realty, leaving a balance estimated to be worth very little more than his debts, thus imposing on creditors the risk of losing a portion of their debts, the transfer is one with fraudulent intent, as to existing creditors, and therefore also fraudulent as to subsequent ones. But that was a voluntary conveyance from son-in-law to mother-in-law, and no evidence to show that the alleged debt to her, constituting the consideration, ever had existence, or that any valuable consideration was paid; while here, saying nothing of the two thousand, seven hundred and forty dollars, the wife assumed a debt of nearly ten thousand dollars—paid the fair value.

In *Rogers* v. *Verlander*, by a deed purely voluntary, between close relatives, the grantor removed from existing creditors a material part of his estate; while in this case Harmison owed no individual debts, and he did not know, and certainly Mrs. Harmison is not shown to have known, of debts yet unpaid of the firm, and swears she did not. I

will add that I do not impugn *Rogers* v. *Verlander*, on its facts. Judge Lucas, in *Greer* v. *O'Brien*, 36 W. Va. 277 (15 S. E. 74) discusses in a lucid manner how far a voluntary conveyance goes to show actual fraudulent intent; holding very properly, accordantly with the very letter of our statute, that because a deed is voluntary, and therefore merely in law void as to existing creditors, it is not from that fact alone fraudulent in fact as to subsequent creditors, without other circumstances in some way shown, which, added to the force of the voluntary conveyance, show the presence of fraud in fact; and he calls attention to the fact that the language of point 4 in *Rogers* v. *Verlander* seems inconsistent with the true rule, and he qualifies it, I may say, as a statement of a general rule, by saying that, as applied to the particular facts, it was correct, as I say also.

Mrs. Harmison's conveyance was not a voluntary conveyance, but cost her ten thousand dollars, besides the two thousand, seven hundred and forty dollars. She left no individual debt of her husband unpaid. The firm was not then largely indebted, so far as we know—a large part of the indebtedness accruing later. She then knew of no firm indebtedness, unless it be the five thousand dollar note. We do not know whether it was a firm or individual debt, and if we can say that she knew of it when she took the conveyance, it is because—only because—she indorsed it, and thus provided for it. We see no act of corruption in the wife, unless we infer it from unpaid indebtedness, unknown to her, and from the fact of the conveyance to her; forgetting what she had paid in the two thousand, seven hundred and forty dollars and the ten thousand dollars further burden she assumed. We see her assuming the five thousand dollar debt, assuming later the four thousand dollar debt of the firm, at Hill's solicitation, when her husband was dead, with no knowledge yet that further liability rested on the firm, though, if she then first knew, it was too late to impeach the conveyances. We see her letting her husband have two thousand, seven hundred and forty dollars, too, on this property, and then assuming ten thousand dollars more; and for conduct which I interpret as evincive of honesty, and of a desire to do more than

was incumbent on her, even as a wife, to save the good name and credit of her husband, and relieve him of worry and distress when his mind was in danger of collapse, we are asked to brand her with sedate and deliberate fraud. There are no badges of fraud sufficient to do this. The case is too weak, in the face of her payment out of a separate estate, fully shown, which no one questions, of so much money, payment shown by deeds, checks, and evidence, so that their payment, or the source of payment, is not questioned. It still remains the law that fraud in fact is not imputed or presumed, and must be proven, and that by the party asserting it. *Greer* v. *O'Brien*, 36 W. Va. 277 (15 S. E. 74). The scales must be made to preponderate clearly against the party charged. Mere suspicion will not do. *Greer* v. *O'Brien, supra; Harden* v. *Wagner*, 22 W. Va. 356, point 9. The decisions on fraudulent conveyances are very numerous and varied, often apparently conflicting. General rules can not be universally applied. Each case turns mostly on its own facts and hue. They control the application of the principles found in the decisions.

Something is said, but not urged, as to the mental condition of Harmison when he made these transfers. It is clear that he was in bad mental condition when making purchases at Huntington, and he had an attack that fall, but took a long vacation in a trip to the West, came back greatly improved, and is proven by his attending physician and other evidence to have been competent at the date of those deeds, though not in good health. So I think it can not be predicated that owing to his condition, his wife made easy prey of him. The evidence shows she took the deeds reluctantly. She says under oath she did, and, unless I mistake the cast of the case, it will turn out a very doubtful step for her, in a pecuniary way. She has yet received nothing in return, and one can see, from her long deposition, that she wishes she were out of it, and had her money back.

The counsel for appellees, without expressly cross assigning it as error, argues that that feature of the decree absolving Mrs. Harmison of personal liability, as if a partner after her husband's death, is erroneous. The chief

ground for this is that, after her husband's death, Hill, the surviving partner, put out handbills of a sacrifice sale of the goods, saying in it, "This, remember, is no advertising dodge, but a sale by order of the administrator of F. J. Harmison, deceased, to close up the business." She was foreign administratrix and legatee. Had she not a right, under the law, to demand that the partnership be closed up? The law required her to do so. From this she is to be made a partner. To the reverse, her order to close up the business shows that she did not intend to continue the business, and shows that any further transaction was one of the old firm in closing out. Another ground relied on to bind her as a partner is that on cross-examination she said she left the closing up to Hill, and did not know what steps he took; that Hill had said to her that he was not buying any goods, only a few samples, such as calicoes and muslins, in order to help close out the stock, and, when asked if she was willing for this, she said yes. This in truth intimates that she had signified to him a wish that he should not buy much. Is it to be said that, just because she did not protest against buying a few articles necessary to close out the stock, she became a partner? I think not. Nobody credited these small items on the faith that she was a partner, and several of these creditors, on oath, say they did not do so on that faith, but on the faith of the old firm. The evidence is wholly insufficient to charge her personally, and the circuit court properly so decided.

We reverse the decree, and dismiss the bill and petitions of creditors, so far as they seek to render Mrs. Harmison personally liable for the debts of Harmison & Hill, and so far as they seek to avoid said two deeds from Harmison to his wife, and to render the realty therein conveyed liable for said debts, and deny the relief so asked; leaving to the plaintiffs and petitioning creditors the right, if they wish, to further prosecute the suit to administer the personal estate of Harmison and Hill for their benefit.