# WHEELING.

### Stockdale, Smith & Co. *v.* Harris *et al.*

Submitted January 29, 1884—Decided March 15, 1884.

. Where a wife purchases land, the burden is upon her to prove dis-
tinctly, that she paid for the land with funds not furnished
by her husband.   Evidence that she purchased amounts to
nothing, unless it is accompanied with clear and full proof, that
she paid for it with funds furnished by some one other than her
husband.   In the absence of such proof the presumption is that
her husband furnished the means of payment.

The opinion of the Court contains a statement of the facts
of the case.

*Thomas E. Davis* for appellant.

*Robert S. Blair* for appellee.

Johnson, President:

In March, 1880, the plaintiffs filed their bill in the circuit
court of Ritchie county to enforce the lien of a judgment
against the defendant G. W. Harris, which judgment was re-
covered before a justice on the 5th day of August, 1875, for
ninety-nine dollars and ninety-five cents with interest and
costs.   The bill alleged, that on the 27th day of June, 1876,
the defendant, G. W. Harris, purchased a house and lot in
the town of Pennsboro in said county of one James L. Poe
for the sum of one hundred and seventy-five dollars, and that
said Poe and wife at the request of said Harris conveyed the
same to Mary L. Harris the wife of the said George W.;
that the purchase-money had all been paid by said G. W.
Harris; and that said conveyance was made with intent to
hinder, delay and defraud the creditors of said G. W. Harris;

that at the time said conveyance was made, said Harris was insolvent. The bill prayed that said deed be declared fraudulent as to the creditors of said G. W. Harris, and that the and be subjected to the payment of plaintiffs' lien.

G. W. Harris and wife separately answered the bill.

G. W. Harris admits his insolvency and denies that he bought or paid for said house and lot, and avers that his wife bought it and paid for it out of her own separate funds.

Mary L. Harris denies, that her husband bought said property, or that he paid anything thereon, and avers that she purchased it and wholly paid for it with her own money. She accounts for the payments as follows: "Poe stated that he would sell it upon the following credits : Fifty dollars in hand; twenty-five the 21st day of July, 1876, and one hundred dollars on the 20th of September, 1876. * * * That she received the money with which she made the down payment from the proceeds of the sale of a cow and calf, which her father-in-law had given her, amounting to thirty-five dollars, and the other fifteen dollars from proceeds of the sale of milk from said cow. * * * For the one hundred and twenty-five dollars balance of purchase-money respondent gave a deed of trust with John Gatrill, trustee, and by the terms of said trust it was due and payable September 20, 1876. Twenty-five dollars of that included in the deed of trust was paid before the same came due, in the manner and form as follows, viz: Eleven dollars of the money she borrowed of Mr. G. W. Thomas, three dollars was for a lounge, her own private property owned by her before her marriage with the said G. W. Harris. One dollar and twenty-five cents was for the sash and glass of a window, which were taken from said house, after she purchased it, and five dollars given her by her father-in-law as a present, and the balance (four dollars and seventy-five cents) her own money saved from her earnings while working as a domestic before her marriage in the family of M. P. Kimball, in the town of Pennsboro. The balance, one hundred dollars, she paid out of the rents and profits of the property.

Poe answered, and in his answer says he sold the property to G. W. Harris, and at his request conveyed it to Mary L. Harris.

Depositions were taken, and on March 10, 1883, upon the pleadings and proof the court dismissed the bill at the costs of the plaintiffs. From this decree the plaintiffs appealed.

Was the bill properly dismissed? In *Rose* v. *Brown*, 11 W. Va. 122, it was held, that, when a wife during coverture purchased land, the burden is upon her to prove distinctly, that she paid for the land with funds not furnished by her husband. Evidence that she furnished amounts to nothing, unless it is accompanied with clear and full proof that she paid for it, with funds furnished by some one else than her husband. In the absence of such proof the presumption is that her husband furnished the means of payment.

*Musgrove* in his deposition says that to secure the deferred payments two deeds of trust were executed. The first was executed by Mary L. Harris alone; that Mr. Poe was not satisfied with this deed and had a second one executed, in which G. W. Harris joined. He says: "The understanding with me at that time was that Mary L. Harris was buying the house and lot." He says he was not present when the contract of purchase was made.

Poe, the grantor, in his deposition says: "G. W. Harris came to me and made a contract for the property. At the time the contract was made between Mr. Harris and myself, there was nothing said as to whom the deed was to be made. As well as I recollect, there was fifty dollars paid in hand; twenty-five dollars in cash and twenty-five dollars was a store-account, which I had with Mr. Harris, and was settled in that way; that is my recollection. I received, as I now recollect, thirteen dollars from Mary L. Harris. Mr. Harris directed me to go there, that she had some money for me as a payment on the property. At the request of G. W. Harris the deed was made to his wife." On cross-examination he said: "The thirteen dollars received from Mrs. Harris and the lounge were received on the second payment of twenty-five dollars." He further says Mr. Thomas paid the last one hundred dollars, and he assigned to him the deed of trust.

*A. Rexroad* in his deposition says that in 1875 he was a constable of Ritchie county; that an attachment against G. W. Harris was placed in his hands to levy on the goods of Harris; that he levied it on the store-accounts of said Harris;

that among them was one against James L. Poe for about fourteen dollars, and below the account was the entry, "transferred and paid." Thinks this was in the fall of 1875.

The deposition of George W. Harris was taken. His evidence under section 22 of chapter 160 of the Acts of 1882 is now competent. He says, that his wife bought the property and paid for it; he had nothing to do with it. "She bought it to have a home for herself and family. I had been in business and was broken up, and had given up for the benefit of my creditors everything I had except eleven dollars, of which I spent ten dollars for a ticket to Baltimore, in order to secure work to support my family. I stayed in Baltimore about four months, took my family there and worked at anything I could get to do. I could not support myself and family and borrowed thirty-five dollars to move me back to West Virginia. * * I came to Pennsboro. I got employment of Kimball, Shaffer & Co., at one dollar and twenty-five cents per day. I remained in their employment most of the time until May, 1882. I made arrangements with G. W. Thomas & Bro. to draw my wages from Kimball, Shaffer & Co., and to furnish me the necessary supplies for my family. When I went to the farm at White Oak, my wages did not pay my store-bill by thirty or forty dollars." He further says: "The money, with which my wife bought this property was partly money she had before our marriage, from the sale of a cow and calf, which I sold for her at her request, and for milk which she sold to different parties while she kept the cow. In this way the first fifty dollars was paid. The next payment of twenty-five dollars was made up from eleven dollars I got at her request from Geo. W. Thomas, or rather got him to pay to Poe for her. She sold a glass and sash and lounge to Poe for five dollars, a present to her from my father, and the balance from money she had earned and saved before our marriage. The last payment of one hundred dollars, was made from the rent of the property." He contradicts Poe as to the store-account, and as to the contract being made by him.

*Mrs. Harris* in her deposition strictly following her answer says as to the first payment, that it was made out of the proceeds of the sale of a cow and calf, which her father-

in-law had given her; the cow she sold for thirty dollars, to David Dixon, and the calf for five dollars, to Eber Mason, and that for the balance of fifteen dollars, she had sold milk from the cow, five dollars worth to Mrs. Kimball, and five dollars worth to Dr. Crumrine; the other five dollars worth she does not mention. She says her husband had nothing to pay with; that he was broken up, and was hardly making a living for his family. His books and accounts were all in the hands of A. Rexroad over a year before the purchase of the property, having been attached by his creditors. On cross-examination she says, that just after her husband failed, he went to Baltimore to live, and he was so poor that they had to come back; that she sold the cow and calf and milk *before* they went to Baltimore. She says in her direct examination, that on the second payment of twenty-five dollars, she paid four dollars and seventy-five cents which she had earned as a domestic before her marriage. This makes fifty-four dollars and seventy five cents at least, which she had in money, if her testimony be true, when she went to Baltimore months before she claims to have bought the property; she says she had been married over two years before she went to Baltimore, and therefore according to her account, poor and hard run as her husband was, as she claims, she had kept a part of the money earned before her marriage all the time since her marriage, yet on cross-examination, in answer to questions we find the following:

Q.—"After your husband failed did you ever live in Baltimore?"

A.—"Yes, sir."

Q.—"What were his circumstances then?"

A.—"So poor that we had to come back."

Q.—"At that time did you have sufficient funds to meet your demands, or had you any money?"

A.—"My husband kept the family. I had some money that I had earned before I was married; I don't know how much. I might have had twenty dollars; can't say positively."

Q —"Did you have as much as twenty dollars when you returned from Baltimore?"

A.—"I can't say that I had."

Q.—"Had you as much as fifteen dollars?"

A.—"I am not certain but think I had as much as ten dollars."

She not only shows by her own deposition that she did not have the fifty dollars she claims she paid down on the property; but David Dixon to whom she says she sold the cow, in his deposition says: "I never bought but traded cows with G. W. Harris. I never bought a cow of either G. W. Harris or Mary L. Harris." If Mary L. Harris had no cow then there was no calf, and no milk from the cow sold, as she claims.

In view of this evidence is it possible to believe that Mary L. Harris out of her own separate funds paid for the property? We cannot believe it. It is impossible for a reasonable mind to credit a story so improbable, although her husband swears to the same thing. She is not only contradicted by others but contradicts herself, and by the frame of her story compels us to believe it a fabrication. The decree must be reversed with costs against G. W. Harris, and the cause remanded, to subject the property to the payment of plaintiff's lien.

REVERSED.   REMANDED.