# CHARLESTON.

## HORNER *v.* HUFFMAN.

Submitted June 9, 1902.    Decided November 29, 1902.

1. FRAUDULENT GIFT.

Money or property delivered by a wife to her husband is presumed, in a contest between her and the creditors of her insolvent husband, to have been a gift, and the burden is upon her to show the contrary.  (p. 42).

2. FRAUDULENT GIFT—*Presumption.*

When the facts and circumstances tend to show, that a gift was intended, and that the husband used and dealt with the property as his own, the mere parol testimony of the husband and wife of a private understanding between themselves, that the transaction was by them considered or intended as a loan to the husband by the wife and not a gift, will not as against the creditors of an insolvent husband rebut the presumption of a gift.  (p. 45).

Appeal from Circuit Court, Barbour County.

Bill by A. F. & J. Wm. Horner against E. G. Huffman and others.   Decree for plaintiffs, and defendants appeal.

*Reversed.*

MELVILLE PECK, for appellants.

J. A. BENT, for appellees.                              :

POFFENBARGER, JUDGE:

Stripped of all erroneous assumptions and groundless contentions, this is a suit in equity by creditors of E. G. Huffman to charge their debt upon the real estate of Hattie A. Huffman, his wife, upon the ground that the debtor had purchased said property with his own money and caused it to be conveyed to his wife with intent to hinder, delay and defraud his creditors, she participating in the fraud. The plaintiffs are A. F. & J. Wm. Horner, of Baltimore, Maryland, who, in April, May, June and July of 1891, sold to E. G. Huffman, who was then engaged in mercantile business, certain goods, and afterwards, on January 13, 1892, obtained a judgment before a justice of the peace against Huffman, for the purchase money of the merchandise sold him, for the sum of two hundred and seventy-five dollars and seventy-six cents. Afterwards, on the 8th day of April, 1897, they recovered another judgment against him before another justice of the peace, upon the same judgment for the sum of three hundred and thirty-five dollars and twelve cents and two dollars and thirty-five cents cost.

In 1885, Huffman and his wife moved to the western states, and remained there for about three years, part of the time in Illinois and part of the time in Kansas. After returning, the husband began a mercantile business at Belington, in Barbour County, in which he continued until 1891, when some of his creditors, upon a creditor's bill, caused all his real estate to be sold and the proceeds applied to his debts. The plaintiffs in this bill, however, were not among those creditors, nor did they come in under the creditor's notice given therein and share in the distribution of the proceeds of the property. Of course, it was a prerequisite to the proceedings of creditors to enforce their judgment liens that all the personal property of the debtor was apparently exhausted, but the manner of its disposition is not disclosed by the record, except that the personal property seems to have passed into the hands of J. N. B. Crim, a heavy creditor of Huffman's, and to have been by him disposed of in some way.

While in Illinois, Huffman became the owner of a tract of land in that state, containing forty-six and one-fourth acres. While in business at Belington, in 1890, before he became indebted to the plaintiffs in this suit, he and his wife conveyed said tract of Illinois land to Charles N. Russell, of Randolph County, West Virginia, a brother of the defendant, Hattie A. Huffman. The consideration expressed in the deed was six hundred and fifty dollars, the receipt of which is thereby acknowledged. E. G. Huffman, however, testifies that he considered the land worth only about one hundred dollars, and that he was indebted to his wife for one hundred dollars, which had been given to her by her parents, and which he had borrowed from her, and that he had conveyed the land to her for the sole purpose of paying his wife said debt of one hundred dollars, she having requested him several times to pay it back to her. After so testifying, he admits that Russell paid him thirty or thirty-five dollars some time after the conveyance, but does not say whether he gave that to his wife or not. Russell, afterwards, in 1893 or 1894, E. G. Huffman says, sold the land to William Gaul, of Dahlgren, Illinois, for the sum of five hundred and fifty dollars. As to the date of that sale, there seems to be no testimony in the record, although the deposition of W. W. Burton, of Dahlgren, Illinois, who says he was the agent who negotiated the sale, was taken. He says that, in doing so, he acted as the agent of Huffman, and supposed the title to the land was in Huffman until about the time the deed was made.

By deed dated the 12th day of August, 1892, A. S. Bosworth conveyed to Hattie A. Huffman a house and lot in the town of Elkins, in consideration of two hundred dollars, paid in cash, and four hundred and twenty-three dollars and ninety cents to be thereafter paid in installments, secured by a vendor's lien on the property reserved in the deed. In April or May, 1891, Huffman and his wife had separated, and she and their children went to the home of her mother. Immediately thereafter, she brought suit for divorce, during the pendency of which the court decreed against him alimony *pendente lite,* and it is claimed by them that about two hundred dollars was paid as such alimony. Huffman says his wife sent him word shortly before the Elkins property was bought that she and her children could no longer stay with her mother, that she had a litle money

and wanted to buy some property, and would pay what money she had on the property and not further prosecute her suit for divorce, if he would help her to meet the deferred payment on the property, and that they met at Elkins about the time the property was purchased and agreed, and the property was pur᠎chased. He says his wife had the money and paid the two hundred dollars. She also says she paid it, with what money she received from her husband as alimony and some other small means she had. Ralph Dardan, who made the sale as agent for Bosworth, swears the money was handed to him by E. G. Huffman. Both husband and wife say this is not true and that Mrs. Huffman paid the money to him herself. The balance of the purchase money was evidenced by two promissory notes, executed by Mrs. Huffman, for the sum of one hundred and eighty-eight dollars and five cents each, and a note for twenty-three dollars and ninety cents, due H. G. Davis, the payment of which, she assumed. The two notes of one hundred and eighty-eight dollars and five cents, were paid by C. N. Russell May 20, 1893, as appears from his check exhibited with the deposition of Mrs. Huffman. How the small twenty-three dollars and ninety cents note was paid, does not appear, although Bosworth says he knows the payments were all made and it is his impression that they were made through Russell.

Very soon after the purchase of the Elkins property, Huffman and his wife became reconciled, and the divorce suit was finally dismissed.

On the 18th day of September, 1893, J. W. Shank and wife, in consideration of one hundred and fifty dollars, conveyed to Hattie A. Huffman a lot in the town of Belington, Barbour County, fronting on Crim's avenue of said town. Of the purchase money, fifty dollars was paid in cash, and Mrs. Huffman's two notes were taken for the residue. The Huffmans say the cash paid was derived from the rents of the Elkins property. On this lot, there is a two story frame house with six rooms and a plank kitchen, in which the defendants reside and which is valued by witnesses at from five hundred dollars to one thousand five hundred dollars, exclusive of the lot. According to the cost of construction, as given by E. G. Huffman, these valuations are entirely too high, and his statements, as to the amounts paid certain laborers who worked on it, are corrob-

erated by their receipts given to Mrs. Huffman. The husband says he did the hauling of materials for her but paid very little money, if any at all. He says Mrs. Huffman's brother sent her a check for twenty-five dollars or thirty-five dollars and another for sixty dollars and ordered doors and windows for her amounting to about twenty-five dollars. Mrs. Huffman says her brother sent her checks for eighty-five dollars, which she used in building the house and also furnished her the windows and doors for it. Thirty-five dollars is the amount mentioned as the purchase money for the lumber used in the construction of the house.

While it is deemed not to have any bearing on the merits of this case, the fact is that J. W. Shank, who conveyed said last mentioned lot, had no deed for it and one W. S. Corbitt now claims the lot. The Tygart's Valley Mineral and Oil Company seems to have laid out in town lots a certain tract of land belonging to it for sale, and to have had an arrangement for facilitating the sale of its stock, whereby a lot was to be conveyed to such of the stockholders as should take three shares and pay seventy-five per cent. of their par value, contemplating that a stock dividend of twenty-five per cent. could be declared and credited to the stockholders and thus pay their subscriptions in full. Under a resolution of the board of directors, setting aside one hundred and sixty-seven of the lots for the benefit of the stockholders, as aforesaid, and an allotment afterwards made, in pursuance thereof, Shank claimed the lot he conveyed to Mrs. Huffman. Claiming that Shank's stock was delinquent, the board of directors, on the 18th day of June, 1897, directed a sale of his stock and the lot which was made to Corbitt, and a deed was made conveying the lot to him. Shank claims he was not in arrears upon his stock and that upon a settlement, giving him credit for moneys that he had paid out for the corporation in procuring its charter, etc., it will be shown that his three shares of stock were not delinquent. However, that controversy has nothing to do with this case, unless it shall be found that the circuit court erred in refusing to subject the interest of Mrs. Huffman in the lot to the payment of the debt of the plaintiffs, or in holding that she has no equitable interest in it. Upon what ground a decree against it was refused, does not appear.

The original bill sought to subject the Belington property to the payment of the claim of the plaintiffs, and the amended bill included also the Elkins property. The demurrer of the defendants was overruled, and, at the hearing, a decree was entered against E. G. Huffman for the sum of four hundred and thirty-nine dollars and thirty-nine cents, determining that in fact the Illinois land was conveyed to C. N. Russell, as trustee, for the purpose of paying out of its proceeds the debt of one hundred dollars due to Hattie A. Huffman, and that the residue of the proceeds belonged to E. G. Huffman, and that four hundred and twenty-five dollars thereof had been applied in payment of the purchase money of the house and lot in Elkins, and charged the payment of said sum upon the said property in the town of Elkins, with interest on it from March 29, 1897, the date of the institution of this suit, and further determining that, as to said sum of four hundred and twenty-five dollars and interest thereon as aforesaid, the deed from Bosworth to Hattie A. Huffman is voluntary and fraudulent. By said decree the deed was set aside as to said sum and interest and the property held to be that of E. G. Huffman, and it was adjudged, ordered and decreed that, unless said sum and interest thereon should be paid by E. G. Huffman within thirty days, the property should be sold, and, in case the proceeds should be insufficient to pay said sum of four hundred and twenty-five dollars and interset thereon and the sum of two hundred dollars, paid on the property by Hattie A. Huffman, with interest thereon from the 29th day of March, 1897, the proceeds, after payment of cost, shall be applied ratable upon said two sums and interest. From this decree, Hattie A. Huffman has appealed.

The overruling of the demurrer is the first ground of error. The argument in that connection is that the judgment of April 8, 1897, is void, for the reason that the transcript of the justice's docket, filed as an exhibit with the original bill, fails to show that the summons was served at least five days before the date of the judgment. It was issued April 3, 1897, and made returnable April 8, 1897. When it was served does not appear, the justice reciting in his docket only that it was "returned properly executed." Section 26 of chapter 50 of the Code requires the summons to be made returnable not less than five

days from its date and prohibits trial or judgment within less than five days after service on the defendant. If the service had been made on the 3rd day of April, trial might legally have been had on the 8th, for the statutory rule for computing time, found in section 12 of chapter 13 of the Code, provides that it shall be done by excluding the first day and including the last day, or if the last day be Sunday, by excluding both the first and last days. Excluding the 3rd day of April, we would have left five days, the fourth, fifth, sixth, seventh and eighth, for the law recognizes no fractions in computing time. Time is not to be determined by counting from one hour of a certain day to a certain hour of another day, but by computing from day to day. A justice's court is an inferior court, and, in favor of its jurisdiction, there is no presumption. It must affirmatively appear. 12 Am. & Eng. Enc. Law, 270; *Rex* v. *Pitts*, 2 Doug. 662; *Day* v. *King*, 5 Ad. & Ell. 359; *Reg* v. *Lewis*, 8 Ad. & Ell. 881; *Griffith* v. *Haries*, 2 Mee & Wels. 335; *Warren* v. *Flagg*, 2 Pick. (Mass.) 448; *Gay* v. *Lloyd*, 1 Greene (Iowa) 78; *Robinson* v. *Prescott*, 4 N. H. 450; *Mahurin* v. *Bickford*, 6 N. H. 567; *Thomas* v. *Robinson*, 3 Wend. (N. Y.) 267; *Bank* v. *Harding*, 5 Ohio 545; 12 Am. & Eng. Enc. Law, 274, and authorities cited in n. 2; *St. Lawrence Co.* v. *Holt and Mathews*, 51 W. Va. 352, (41 S. E. 351, 356). The jurisdiction of inferior courts may be inquired into collaterally. 12 Am. & Eng. Enc. Law, 274. But if the record of an inferior court shows that the necessary jurisdictional facts were ascertained, it cannot be collaterally impeached. 12 Am. & Eng. Enc. Law, 274, note 3 and authorities cited. Upon this last proposition it might be insisted that the entry, "Summons was returned properly executed," shows that the justice ascertained that service was had on the 3rd day of April; but it certainly cannot be said that this is an express recital of such ascertainment. All that is necessarily included in the words "properly executed" is that it was served at some time in the manner prescribed by law, as by delivering a copy thereof to the defendant or to a member of his family, or by posting at his residence.

However, the transcript shows service of process on the defendant before the rendition of the judgment. It also discloses a subject matter clearly within the jurisdiction of the justice. This brings both parties and subject matter within

his jurisdiction. Ordinarily, this would make jurisdiction absolutely complete, and any wrongful proceeding thereafter would be merely error, not affecting jurisdiction. But, as the civil jurisdiction of a justice of the peace is statutory, and for his authority he must look to the statute, the rendition of a judgment by him contrary to an express prohibition of the statute may be a void act. *Wilkinson* v. *Hoke,* 39 W. Va. 403. Whether a judgment so rendered is void or not need not be determined here, for the reason that the defendants have not put themselves within the requirements of the law as laid down by this Court in *Newlon* v. *Wade,* 43 W. Va. 283, and *Moren* v. *Fire-Clay Co.,* 44 W. Va. 42. In the former case, it is said that the process and judgments of justices' courts are entitled to the same respect, to the extent of their jurisdiction, as those of other tribunals, and the defendant was not permitted to show collaterally that the cause of action did not arise within the county in which he was sued. In the other case it was held that the fact that the return of process, as shown by the transcript, was defective, was not so conclusive as to render the judgment void. In the opinion it was said that, in bringing suit to enforce the lien of the judgment, it was not necessary to produce the whole record, and also that the plaintiff was not required in such case to allege and show due service of process. The substance of these rulings is, that while the judgments of justices' courts may be impeached in a collateral proceeding, the burden is upon him who so undertakes to impeach such judgment to show want of jurisdiction. Had the defendants produced the whole record of the case in the justice's court and shown by it that, in fact, the process had not been served five days before the rendition of the judgment, it would be necessary to say, as matter of law, whether the judgment is void. As a rule, there is no presumption in aid of the judgments of inferior courts. 1 Black on Judg., s. 282. But it may be doubted whether that rule extends to an act of the kind in question here, if it be jurisdictional. The court had general jurisdiction of the subject matter and of the parties, and, having that, there is a presumption in favor of the regularity of its proceedings. Why should there not be, the defendants having notice of the proceeding, and the court having full power to proceed? "It is further to be remarked that, although a court

may be an inferior or limited tribunal, yet if it has general jurisdiction of any one subject, its proceedings and judgments in respect to that subject will be sustained by the same liberal presumptions as to jurisdiction which obtain in the case of the superior courts." 1 Black on Judg., s. 282.

It is deemed proper to here dispose of certain groundless contentions found in the brief for appellants, one of which is that the doctrine of *laches* applies. The demand sued on is legal in its nature, and belongs to the class called contract liabilities, and it is not barred by the statute of. limitations. *Laches* is never applied by a court of equity to a legal demand when the time elapsed since the cause of action accrued is less than the statutory period of limitation, unless it be under peculiar circumstances, and the delay has put the other party at a disadvantage and subjected him to great hardships. 12 Am. & Eng. Enc. Law, 572. This is not a suit to enforce the lien of a judgment, but one to set aside a fraudulent conveyance. An action, suit or *scire facias,* may be brought at any time within ten years from its date, on a judgment on which no execution has issued within two years. Section 10 of chapter 139 of the Code. The five year statute found in section 14 of chapter 104 of the Code, does not apply, if fraud in fact be alleged, as it is here, and proved as is attempted here. *Hunter v. Hunter,* 10 W.Va. 321; *Himan v. Thorn,* 32 W. Va. 507; *Glasscock v. Brandon,* 35 W. Va. 84. It is a suit to set aside a conveyance of land on the ground of fraud, belonging to the exclusive jurisdiction of equity, and unaffected by any statute of limitation, it is true, but, in numerous cases, this Court has held that a delay of five years or more in cases of this class does not of itself constitute *laches.* The only intervening circumstance which might put the appellants at disadvantage is the death of C. N. Russell, a brother of Mrs. Huffman, who, if living, could testify concerning the sale of the western land. Anything he might be able to say about that, if living, would be wholly insufficient to meet and overcome the circumstance relating to it and subsequent transactions giving rise to the inference of fraud. It is to be remembered, too, that the object of this suit is not the setting aside of the sale of the western land, but the conveyance to Mrs. Huffman of the Elkins prop-

erty, made to her in 1892, and other property subsequently conveyed to her.

In passing upon the question of good faith on the part of Mrs. Huffman and her husband, toward the creditors of the latter it is necessary to add to the facts already stated, that, at the time the Elkins property was purchased, she had no means other than the one hundred dollars due her on the land conveyed to Russell and the small amount she received as alimony, whatever it was; that neither she nor her husband claims that she received from any source other than the rents of her property any money except what Russell paid to her and for her two hundred dollars from her mother and two hundred and sixty dollars or two hundred and seventy dollars borrowed from J. N. B. Crim, and an extension of credit by B. B. Rohrbough for one hundred and nine dollars, for materials furnished her by him; that she purchased the Elkins property at the price of six hundred and twenty-three dollars and ninety cents in 1892, the Shank lot for one hundred and fifty dollars in 1893, and built a two story house on it with six rooms and kitchen, another lot in the town of Belington from one Corbitt, on which she has erected a ten room frame house, plastered throughout, and another lot in the town of Womelsdorff, on which she has erected a large frame house, plastered throughout; and that there is evidence tending to show that her husband's property was not all applied on his indebtedness in 1891, so as to incapacitate him to aid her in the procurement of all this property. It is to be remembered that his wife sued him for a divorce and alimony along about April, 1891. On the 24th day of April, 1891, he executed a contract in the nature of a deed of trust on all of his real and personal property, including his stock of goods, accounts, notes and choses in action, ostensibly to secure about four thousand dollars loaned and to be loaned to him by Mr. Crim. He says he received a great deal of money from Mr. Crim and, out of it, paid off some of his debts, including those due to Harper Bros. and the Cumberland Milling Co. He testifies that he has settled with Spidell & Co., Sheringer & Co., and Loeb & Lockhein, others of his creditors. This seems to have taken place since his real estate was sold. On July 30, 1891, he sold the stock of goods to C. G. Harmon for about one thousand and one hundred dollars, taking Harmon's note and a horse valued at ninety dol-

lars. How much of the proceeds of the sale of the stock of goods went to Crim he does not say, but he says Mr. Crim got the accounts and notes, some of which have not been collected. F. M. Howes testifies that Huffman told him, at about the time he quit merchandising, that he had voluntarily turned over to Mr. Crim three or four thousand dollars worth of notes and accounts, and that he had Mr. Crim's check for two hundred dollars, with which he had bought two horses and a wagon. In her divorce suit, Mrs. Huffman testified that her husband had conveyed three pieces of property in the west to her brother, C. N. Russell, for the purpose, as he told her, of keeping his creditors in the west from taking it. Both Mr. and Mrs. Huffman testified that C. N. Russell never paid anything for the western land except thirty or thirty-five dollars which he paid E. G. Huffman, and eighty-five dollars paid to Mrs. Huffman, the windows and doors furnished for her building, and what he paid on the Elkins property.

Applying to these facts and circumstances the rules and principles laid down by this Court in reference to transactions between husband and wife, as against creditors of the former, this property in the hands of Mrs. Huffman is undoubtedly liable for the debts of her husband. Here, the wife has acquired property of considerable value during coverture and without having any means of consequence of her own prior to the time of acquiring it. In such case, the burden is upon her to prove clearly and distinctly that she paid for it with funds derived from sources other than her husband. The proof must be clear and full that she paid for it with funds not furnished by her husband. In the absence of such proof there is a presumption that her husband furnished the means of payment. *Stockdale* v. *Harris,* 23 W. Va. 499; *McMaster* v. *Edgar,* 22 W. Va. 673; *Rose* v. *Brown,* 11 W. Va. 122; *Core* v. *Cunningham,* 27 W. Va. 206; *Herzog* v. *Weller,* 24 W. Va. 203; *Burt* v. *Timmons,* 29 W. Va. 441; *Spence* v. *Smith,* 34 W. Va. 697; *Martin* v. *Warner,* 34 W. Va. 182. The proof offered by Mrs. Huffman does not measure up to the requirements of this rule. Her husband does not seem to know where she obtained the two hundred dollars with which the first payment was made on the property in Elkins, and she claims it was the money which had been paid her as alimony, her mother, with whom she resided while sep-

arated from her husband, not having charged her any thing for her board. But they are both uncertain as to the amount of alimony paid. Mr. Huffman says he thinks it was something less than two hundred dollars, besides about one hundred dollars worth of clothing and other necessaries given by him to the children. When asked where she got the $200.00, Mrs. Huffman said: "Why, the court compelled Mr. Huffman to furnish me money to carry on a law suit, and for me and my children's support at that time, and some other small means." She does not know whether her allowance exceeded two hundred dollars, and does not recollect of paying her attorney anything. She does not undertake to say from what source she derived the other small means. It is admitted that the greater part of the purchase money of that property was paid by C. N. Russell, and it is contended that the money so paid by him was a gift to his sister and that one hundred dollars was the value of the western land conveyed by Huffman to Russell. Russell being dead, it is impossible to obtain much information concerning that transaction except what is stated by Mr. and Mrs. Huffman. Their deed to Russell recited a consideration of six hundred and fifty dollars, and, in two or three years afterwards, Russell sold the land for five hundred and fifty dollars. Then Burton testifies that he had charge of the farm, as agent of Huffman, and acted as his agent in effecting the sale to Gaul, without knowledge that the title was held by Russell. These circumstances, in cases of this kind where there is a presumption against the *bona fides* of the conduct of husband and wife, in respect to the property of the former, are amply sufficient to establish the fact that the money paid by Russell was the purchase money of the western land.

Another well settled principle, of the same nature as the one referred to, is, that in cases of this class, direct proof of fraud is not required. It may be legally inferred from the facts and circumstances of the case, when they are of such a character as to lead a reasonable man to the conclusion that the conveyance was made with intent to hinder, delay and defraud creditors. *Lockard* v. *Beckley,* 10 W. Va. 87; *Livesay* v. *Beard,* 22 W. Va. 585; *Sturm* v. *Chalfant,* 38 W. Va 249. In addition to the suspicious circumstances relating to the western land and the disposition of the personal property of E. G. Huffman, al-

ready referred to, it is inconceivable that Mrs. Huffman, who is shown to have carried on no business other than keeping house for her husband, could have acquired all the property which is now shown to stand in her name. It is true, there is indebtedness upon some of it, made in her name, but clearly a considerable amount of money has been paid upon it, more than she, by her own exertions together with the manual assistance of her husband, he supporting the family, could have obtained. Her evidence shows upon its face that she has had little or no experience in business. Practically all the details concerning the acquisition of this property have been given by her husband. She seems to know very little about it. These circumstances strongly indicate that these various transactions are mere devices on the part of the husband to avoid the payment of his debts, and the wife must have known, not only that he was indebted to the plaintiffs and others, but also that his shifting his property into her name could have been for no other purpose than to put it out of the reach of his creditors. Her acceptance of it under such circumstances and with such knowledge amounts to participation in his fraudulent intent and conduct.

Very little, if anything, could have been saved by Mrs. Huffman from the alimony allowed her. It was allowed her for her support and her expenses in prosecuting her suit. A reasonable inference from the circumstances disclosed by the evidence is that she used it for those purposes. Even if her mother charged her no board, payment of her attorneys and the discharge of her little personal expenses and those of several children for a year or more would take practically, or quite, all of it. For the one hundred dollars she claims to have loaned her husband, she can make no claim as against her husband's creditors under the well established law of this State. She took no note and there is no evidence to establish such loan except the declarations of herself and her husband. Even if they claimed it was invested by him in the western land and not used generally in his business it would be insufficient to establish her title to it, for in the absence of clear proof of its having been delivered in pursuance of an express contract for its repayment, the law presumed in favor of creditors, that it was a gift by the wife to the husband. See *McGinnis* v. *Curry*, 13 W. Va. 29; *Bank* v. *Atkinson*, 32 W. Va. 203; *Zinn* v. *Law*, 32 W. Va. 447.

From what has been said it is clear that the decree cannot be reversed at the instance of the appellant. But the appellees cross-assign error and say the court below should not have allowed Mrs. Huffman said sum of two hundred dollars, and should not have allowed her anything out of the proceeds of the property. Under the evidence and the circumstances shown, the cross-assignment must be sustained.

It is further insisted by the appellees that the court below erred in refusing a decree against the Shank lot, but this objection is not well taken. No mention of that lot is found in the decree. As nothing was done respecting it, there can be nothing to correct, nor any ground for complaint.

For the error in holding Mrs. Huffman entitled to two hundred dollars as an investment in the house and lot in Elkins, and limiting the appellees to the sum of four hundred and twenty-five dollars in charging their debt upon it, the decree must be reversed with cost to the appellees, and the cause remanded to the circuit court of Barbour County with directions to enter a decree subjecting said property to the payment of the debt of the plaintiffs, and for further proceedings according to the rules and principles governing courts of equity.

*Reversed.*