# CHARLESTON

PICKENS *v.* WOOD *et al.*

CRIM *et al v.* TALBOTT *et al.*

Submitted January 12, 1905.    Decided March 28, 1905.

1    HUSBAND AND WIFE— *Creditor of Husband.*
    Where a husband buys land in his own name and suit is brought
    by his creditor to subject the land to the payment of the husband's
    debts, the uncorroborated evidence of the husband is, alone, insuf-
    ficient to establish an express trust in favor of his wife in such land
    arising by parol agreement between such husband and wife.   (p.
    486 )

2.    HUSBAND AND WIFE— *Mala Fides Presumed.*
    In such case there is *prima facie* a presumption of *mala fides* as to
    such agreement.   (p. 487.)

3.    HUSBAND AND WIFE—*Presumption of Gift.*
    In such case when it is shown that the wife furnished to the hus-
    band part of the purchase money paid by him for the land there
    is *prima facie* a presumption that the money furnished by the wife
    was intended as a gift to the husband.   (p. 487.)

4.    HUSBAND AND WIFE—*Resulting Trust—Evidence.*
    No resulting trust can be raised in favor of a wife from the pay-
    ment by her of a part of the purchase money on land bought by her
    husband in his own name, unless it is shown with certainty and ex-
    actness, what part of the purchase money was paid by her.   (p.
    488.)

5.    PRINCIPAL AND SURETY—*Subrogation—State a Party to Suit.*
    Where a surety pays a judgment rendered in favor of the State
    against such surety and his principal, such surety may maintain a
    suit to enforce the lien thereof for his benefit, without making the
    State a party to the suit.   (p. 491.)

Appeal from Circuit Court, Barbour County.

Bill by James Pickens' executors against Joshua Wood and
others.   Decree for plaintiffs, and J. N. B. Crim, defendant,
appeals.

*Reversed.*

MELVILLE PECK, for appellant.

A. G. DAYTON and J. HOP. WOODS, for appellees.

COX, JUDGE:

This is a contest between the heirs of Jemima Wood the
second wife of Joshua Wood, and J. N. B. Crim, his credit-
or, who seeks to subject to the payment of debts against

Joshua Wood two tracts of land in Barbour county, containing respectively one hundred and seventy-six acres purchased by Joshua Wood of L. D. Morrall, special commissioner, under decree in the cause of *Chrislip* v. *Chrislip*, at the price of $2,300.00, in the year 1856; but for which no deed was ever made to Wood. So far as the record discloses no deed was ever authorized in that cause although the sale was confirmed. Joshua Wood paid on the purchase money about the time the sale was confirmed the sum of $565.30, the amount coming to a widow under the decree in that cause, and probably paid the costs of suit and sale. Some time after the sale Morrall, commissioner, brought suit against Wood for the residue of the purchase money, which suit remained pending until 1875 when it was dismissed agreed. The balance of the purchase money was paid by Joshua Wood in the year 1873 by paying the same to the Chrislip heirs who were entitled to it instead of paying to Morrall, commissioner. Jemima Wood died in 1878 and Joshua Wood afterwards re-married. The heirs at law of Jemima Wood allege that the land was originally purchased at the price of $2,300.00 and that the balance paid in 1873 was about the same amount. On the 21st day of September, 1885, Joshua Wood conveyed all this land to Melville Peck, trustee, to secure to the National Bank of Kingwood a debt of $1,000.00. On the 13th day of October, 1885, Joshua Wood conveyed the one hundred acre tract to James M. Wood, his son by his wife, Jemima, in trust for the sole use and benefit of his third wife, Emaline, retaining a lien to secure the payment of certain debts, namely: A debt of $1,-000.00 to the National Bank of Kingwood; two debts to J. N. B. Crim, one of about $159.00 and the other of about $150.00; a debt to Heatherly of about $50.00, and to Robinson the taxes of the current year. Also on the 13th of October, 1885, Joshua Wood conveyed by deed the seventy-six acre tract to his seven children by his second wife, reciting therein that the land had been paid for with the money and property of his second wife, and that when purchased was intended by agreement to be conveyed to her. At December rules 1885, the original bill in this cause was filed by James Pickens against Joshua Wood *et al.* to enforce the lien of a judgment against Wood in favor of Pickens and to set aside the two deeds made by Wood on the 13th of October, 1885, as fraud-

ulent. The bill makes a number of lien creditors parties and sets up the existence of such liens. Crim was a party defendant to this suit. The cause was afterwards referred to a commissioner and depositions taken. Joshua Wood answered the bill. The pleadings raising the principal issue here are the following:

An amended answer in the nature of a cross bill filed by Crim at December rules 1901, setting up that all the liens against Joshua Wood had been paid except certain ones amounting to considerable sums of money to which Crim was entitled and asking to set aside the two deeds of October 13, 1885, as fraudulent, and to enforce his liens against said land; the answer of the children and heirs at law of Jemima Wood denying the validity of Crim's liens and setting up a trust in all of said land in favor of their mother, and in their favor as her heirs on the ground that the original purchase money was paid by their mother and not by their father, and that during her life their father held the equitable title to the land in trust for her, and that after her death and up to the time the land was conveyed their father held it in trust for them as her heirs, subject to his curtesy, and replication to said answer. On the 31st of May, 1904, this cause was finally heard with the cause of Crim and Robinson against Talbott *et al.* and a decree pronounced in favor of the heirs of Jemima Wood, the second wife of Joshua Wood, establishing the right of the heirs to said land and ordering a conveyance to them and to James M. Wood, their alienee, according to their interests therein. The decree further adjudicated that the liens claimed by Crim were not charges upon the said land, and other matters not necessary to detail here. From this final decree Crim appeals.

The record of the cause of *Pickens* v. *Wood* was the only one brought up and printed in this Court until after the submission thereof, when the Court under the rule adopted in the case of *Fisher* v. *McNulty*, 30 W. Va. 186, awarded a *certiorari* to bring up the record of the cause of *Crim & Robinson* v. *Talbott et al.*, and that record is now before us.

The only direct evidence offered to sustain the contention of the heirs at law of Jemima Wood as to the existence of the trust in her favor is the evidence of Joshua Wood, the debtor, taken on the 17th day of March 1888. He testifies that he

bought this land for himself and further that "Not long after the sale of the land I became involved by being surety and was broken up and suit was brought against me by L. D. Morrall commissioner, for the purchase money due on said land, I fought the suit for a long time, and finally my wife got money from her father, John Reger's estate, and I bought the Chrislip heirs out of their interest in said land with my wife's money, part of said money was from proceeds of lands inherited by her father which I sold and the other money was what she got from her father's estate. My wife, Jemima, like many other women, came very much dissatisfied by me getting into security so badly, and refused for her money to be used, unless she could control it, and I agreed with her that the deed for said land should be made to her and her children, and I so directed Lair D. Morall, Commissioner, to make said deed to her and her children. The deed never was made. I made different applications for the deed but the deed never was made. Finally she died but she claimed said land up to her death."

Analyzing this parol agreement testified to by Joshua Wood we find that it purports to be something more than that the wife shall have a part of the land by furnishing a part of the purchase money. So far as this alleged agreement can be taken to be an agreement for the purchase of Joshua Wood's whole interest in the land in consideration of furnishing part of the purchase money, it is an agreement of purchase and not enforceable without writing. This is true notwithstanding the subject matter of the purchase is an equitable estate. Browne on Statute of Frauds, section 229; *Hughes* v. *Moore*, 7 Cranch (U. S.) 176; Wood on Statute of Frauds, section 227. This defeats the claim of the heirs of Jemima Wood to an equitable estate in the whole land. If the agreement testified to by Joshua Wood was otherwise free from objection and was established by sufficient evidence it could be considered as an agreement raising a trust in favor of the wife to an interest in the land proportionate to the part of the whole purchase money furnished by her. Viewing it in this light such an agreement need not be in writing, or proved by writing. *Currence* v. *Ward*, 43 W. Va. 367; *Murry* v. *Sell*, 23 W. Va. 475; *Heiskell* v. *Powell*, 23 W. Va. 717; *Seiler* v. *Mohn*, 37 W. Va. 507. However, where

parol evidence is admissible to establish a trust such evidence must be clear, full and unquestionable to produce such result. *Troll* v. *Carter*, 15 W. Va. ·567; *Craig* v. *Craig*, 54 W. Va. 183; *Hamilton* v. *McKinney*, 52 W. Va. 317; *Armstrong* v. *Bailey*. 43 W. Va. 778; *Currence* v. *Ward*, 43 W. Va. 368; *Shaffer* v. *Fetty*, 30 W. Va. 248; *Woods* v. *Ward*, 48 W. Va. 652. This rule is applied rigidly where the rights of creditors are involved.

The question for us to determine is whether or not this agreement is proved by sufficient evidence. It is claimed that the evidence of Joshua Wood as to this agreement is corroborated by the facts and circumstances appearing in the cause, and this leads us to an examination of those facts and circumstances. They are as follows: Jemima Wood received some money or property from the estate of her father, and probably from the estate of her mother, about the year 1873, near the time when the balance of the purchase money on this land was paid by her husband. It does not clearly appear what amount she received or exactly when she received it. Joshua Wood suggested to Morrall, commissioner, that he make the deed for the land to Jemima Wood saying that the money or the greater part of it paid for the land came through her and that she had received it from her father, John Reger, or his estate. Wood did not at this time according to the evidence of Morrall say anything about there being an agreement between him and his wife that the land should be conveyed to her because of her payment of the purchase money. He did not disclose the purpose for which he desired the conveyance to be made to her. Two brothers by the name of O'Brien testify that in a conversation with John Reger, the father of Jemima Wood, about 1870 or 1872, shortly before Reger's death, he told them, in effect, that he had sold some land and intended to give the proceeds to his daughter, Jemima, to assist in paying for the land on which she and her husband lived, being the land in question. One of the brothers says that he thinks Reger told him that he had already let her or them, have a part of the money. This testimony, if true, was the evidence of mere declarations of a person not under oath principally as to the future intentions of such person. John Reger died shortly after the time of this conversation and there is no evidence that he ever carried out the inten-

tions thus expressed. Joshua Wood seems to have been involved financially from a time shortly after the purchase of the land until his death in August, 1902, but it does not appear what his earnings were during all these years. Some of his debts were security debts but it does not appear that all were security debts, and it does not appear what became of the money received by him for which the debts, other than security debts, were incurred. Joshua Wood paid the taxes on the land, at least, until 1885. The public record shows that he had equitable title to the land until he made the deeds of October 13, 1885. The land appeared on the land books in his name. He lived on, occupied, and dealt with the land as his own. In September, 1885, he executed a deed of trust on all of the land to Peck, trustee. He owned no other real estate so far as the record discloses. By his two deeds of October 13, 1885, he disclaims the idea of a trust in favor of his second wife as to the one hundred acre tract by conveying it to his son by that wife in trust for his third wife. By his testimony explaining these two deeds he says that he made these deeds because these claims mentioned in the deed to his son as trustee, constituted the first liens, and because he believed the amount of the liens was all the land would bring. This conflicts directly with the idea of the trust in favor of the second wife because if such trust existed in favor of his second wife the liens referred to were not liens upon the land farther than his curtesy therein. So far as this record shows Jemima Wood never claimed, used, or exercised acts of ownership over any of this land or paid the taxes on it, although she lived for five years after the time of the alleged trust agreement and after the payment of the balance of the purchase money. It is true that Joshua Wood testifies that she claimed it, but he fails to show how or to whom. If this trust existed both she and her husband kept it a profound secret until her death and he for many years after her death. In the meantime the debts here sought to be enforced were incurred. The children and heirs at law of Jemima Wood never made any claim to this land or any part of it until the deed for the seventy-six acres was made to them on the 13th of October, 1885, and then only to the seventy-six acres. This was seven years after their mother's death. They never claimed the whole one hundred-seventy-six acres until the time

of the filing of their answer to the amended answer or cross bill of Crim, on the 20th day of July, 1903, thirty years after this trust agreement is alleged to have been made, and twenty-five years after their mother's death. By their first answer in this cause they only claimed the seventy-six acres as the trust property from their mother.

In determining the question as to whether or not the facts and circumstances corroborate the testimony of Joshua Wood as to the trust agreement we must consider all the facts and circumstances together, as well as the acts and conduct of the parties so far as admissible. All the facts and circumstances appearing in this record, as well as the acts and conduct of the parties when considered together, do not corroborate the testimony of Joshua Wood as to the existence of this trust agreement but point almost irresistably in the opposite direction. In considering the testimony of Joshua Wood we must do so in the light of certain well settled principles applicable thereto. This is an alleged transaction between husband and wife. When a transaction between husband and wife, where a strong natural motive exists to provide for each other at the expense of creditors, is sought to be impeached as fraudulent, it requires less proof to show fraud, and on the other hand where a *prima facie* case of fraud is made, much stronger proof to show fair dealing than would be required if the transaction were between strangers. *Livey* v. *Winton*, 30 W. Va. 554; *Burt* v. *Timmons*, 29 W. Va. 441. In a contest between the creditors of the husband and the wife or her heirs, owing to the great facility which the marital relations affords for the commission of fraud, there is, as there should be, a presumption against the *bona fides* of a transaction between the husband and wife, which the wife or her heirs must overcome by clear and satisfactory evidence. *Crowder* v. *Garbe* (Va.) 34 S. E. 470; *Walker's Admx.* v. *Peck*, 39 W. Va. 325; *Wood* v. *Harmison*, 41 W. Va. 376; *Miller* v. *Gillispie*, 54 W. Va. 450.

If the evidence were sufficient to justify the conclusion that Jemima Wood furnished to Joshua Wood a part of the purchase money of this land (there is no proof of it, except his testimony), then we are met with another presumption. When the money passed from her to him to whom did it belong after he received it and applied it to the payment of the pur-

chase money of the land? As against the creditors of the husband the money furnished is presumed *prima facie* to be a gift to the husband by the wife. *Crumrine* v. *Crumrine*, 50 W. Va. 226; *Horner* v. *Huffman*, 52 W. Va. 40; *McGinnis* v. *Curry*, 13 W. Va. 29; *Zinn* v. *Law*, 32 W. Va. 447; *Bank* v. *Atkinson*, 32 W. Va. 203. The burden of proof is on the wife or those claiming under her to rebut such presumption and in order to do so the evidence must be full, clear and above suspicion.

To rebut these presumptions of *mala fides* in the transaction and that any money furnished by Jemima to Joshua Wood was intended as a gift the uncorroborated evidence of Joshua Wood surrounded by circumstances of suspicion is offered. Shall we sustain this alleged express trust against a creditor of the husband upon such evidence? If we do we open wide the door for fraud in nearly every case where the marital relation exists. It would in such case provide a powerful and effective defense to the husband's debts. One so easily asserted and so difficult to disprove. The false claim of a secret trust is more dangerous than a fraudulent conveyance placed upon record which gives notice to the world and may be attacked while the evidence is at hand. A secret trust may be claimed to have rested solely within the knowledge of the husband and wife for years until all evidence to overthrow it is beyond reach and then be brought forth to defeat the collection of just debts contracted upon the faith that the ownership of the property is as the record shows it to be. To establish a secret trust upon such evidence would enable the debtor to defeat his debts upon the mere declaration that his property is not his own. Such a secret trust should never be enforced against the creditor of the husband in favor of the wife, except upon the clearest and most convincing proof. Its enforcement upon such evidence as here presented would be contrary to all principles of equity and fair dealing. We hold, therefore, that the uncorroborated testimony of a husband is alone, insufficient to establish an express trust in favor of his wife in land purchased by him in his own name against his creditors seeking to subject such land to the payment of their debts.

If there was sufficient evidence to show that Jemima Wood furnished a part of this purchase money and that she was to

have an interest in the land in proportion to the part of the whole purchase money furnished by her, still no trust in her favor could be enforced under the facts appearing in this record because of the uncertainty as to the amount furnished by her. There is no evidence in the case showing the exact amount furnished by her. Again the testimony of Joshua Wood is the only evidence on the subject, and he cannot say how much of the purchase money he paid, thus leaving it uncertain as to how much she paid; and without certainty and exactness as to the amount she paid the trust in her favor can not be enforced. *Currence* v. *Ward*, 43 W. Va. 367; *Shaffer* v. *Fetty*, 30 W. Va. 248; *Coleman* v. *Parran*, 43 W. Va. 737.

While what we have already said must reverse the decree of the lower court there are other questions arising in the record.

This case was referred to commissioner Kittle to ascertain and report the liens and their priorities etc. His report, dated the 10th of April, 1900, was filed. He reports in effect, that Joshua Wood, on the 13th day of October, 1885, conveyed the one hundred acres in trust to James M. Wood, trustee, and that the annual rental value thereof is $85.00; that the liens against the one hundred acres are as follows:

A judgment in favor of J. N. B. Crim, assignee of Alexander Pickens, etc. against Joshua Wood, dated July 17, 1885, and docketed April 8, 1885, amounting to $328.82.

A deed of trust debt in favor of J. N. B. Crim, assignee, for $1,000.00 with interest from August 28, 1895, amounting to $1,284.33.

A judgment in favor of J. N. B. Crim, assignee of the Farmer's Bank against John P. Thompson cashier, G. L. Stalnaker, J. N. B. Crim and Joshua Wood, dated July 9, 1885, and docketed October 27, 1885, amounting to $275.84.

One-half of a decree of $3,879.12 in favor of J. N. B. Crim, assignee of the State of West Virginia against James W. Talbott, etc. late sheriff of Barbour county, the one-half amounting to $1,939.56, which was a judgment of the State of West Virginia against James W. Talbott, Henry A. Gall, William McClasky, J. N. B. Crim, Jacob W. Robinson, A. B. Modisett, Joshua Wood, I. B. Talbott, A. M. Talbott, B. D. Gall and J. W. Corder.

The report purports to ascertain the priorities of said liens

against the one hundred acres. This report was excepted to by Crim, also by Joshua Wood, —— by Crim because the commissioner failed to report the seventy-six acres subject to the liens claimed by Crim. This exception in our view should have been sustained and the report set aside, and the cause re-committed.

The statute of limitations is relied on as a defense to the debts reported by the commissioner. So far as the debts reported by the commissioner are liens either under the deed of trust of the 21st of September, 1885, or the deed of the 13th of October, 1885, to James M. Wood, trustee, the statute of limitations does not apply to the enforcement of the liens therefor.

It is claimed that the evidence and the facts appearing do not prove that Crim paid the State judgment mentioned in said report. Having examined the record of this case and the case of Crim and Robinson against Talbott *et al.* we do not think this claim is justified. On the contrary we think that it clearly appears that Crim is entitled to the benefit of the State judgment for any balance remaining due to him after the payments and applications shown in the record of the case of Crim & Robinson against Talbott *et al.*

It is contended that the right of Crim to enforce said State judgment for such balance is barred by the statute of limitations and by the doctrine of *laches* or of estoppel. We do not consider this contention well founded. The State judgment referred to was a judgment rendered in favor of the State by the circuit court of Ohio county on the 24th of April, 1878, upon the official bond of J. W. Talbott, sheriff of Barbour county, and his sureties therein for the penalty thereof to be discharged by the payment of $6,740.26 and costs. Crim, Robinson and Wood were sureties of Talbott and the judgment was rendered against them and the other sureties. Execution was issued on the judgment on the 16th of September, 1878, and placed in the hands of the sheriff of Barbour county. The judgment was entered on the judgment lien docket in Barbour county on the 18th of September, 1878. At September rules, 1887, J. N. B. Crim and J. W. Robinson, claiming to have paid the judgment, filed their bill in equity against Talbott and all their co-sureties, living, and the personal representatives of those deceased, for the pur-

pose of enforcing the lien of said judgment for the benefit of the plaintiffs and for contribution from the co-sureties. That suit of Crim and Robinson against Talbott *et al.* remained pending and was heard with this cause at the time the decree complained of was entered. Robinson, it seems, only paid $125.00 of the State judgment. Crim occupies a double relation to that judgment, one as surety, paying off part of the judgment and the other as a co-surety, against whom it was rendered. Upon this state of facts and under the circumstances appearing it seems clear to us that, neither the statute of limitations, nor the doctrine of *laches* or of estoppel bars Crim's right to enforce the lien of that judgment for the balance due him thereon. In the case of *Weimer*, *Wright*, *&* *Watkins* v. *Talbot et al.*, recently decided by this Court, 49 S. E. 372, the law applicable to the questions here presented was announced. From the opinion delivered by JUDGE POFFENBARGER in that case we quote the following: "The lien of a judgment ceases to exist when a *scire facias* or action thereon is barred by the statute of limitations, and not before. *Shipley* v. *Pew*, 23 W. Va. 487. 'Where execution issues within two years as aforesaid, other executions may be issued on such judgment without notice, within ten years from the return day of the last execution issued thereon, on which there is no return by an officer, or which has been returned unsatisfied.' Code 1899, chapter 139, section 10. Since the lien exists as long as execution may issue on the judgment or *scire facias*, or action thereon may be had, neither the statute nor *laches* can bar it, for the lien gives a clear right to satisfaction of the judgment, and equity will enforce it. Its existence precludes the possibility of any waiver, abandonment, lack of diligence, or any other element of *laches*." As to what part of the balance due Crim can be charged against Joshua Wood or his estate, the case last referred to is again in point and we quote from the opinion as follows: "The right to recover at law seems to be limited to an aliquot part of the debt to be determined by a division according to the whole number of co-sureties solvent and insolvent. But in equity a surety who pays the debt of his principal is entitled to have as contribution from his solvent co-surety a pro rata amount of the sum paid by him based upon the number of solvent co-sureties, excluding insolvent ones. Brandt on Sur.

& Guar., section 288; Story's Eq. Pl., section 496; *Preston* v. *Preston*, 4 Grat. 88; 47 Am. Dec. 717; *Dent* v. *Waits' Adm'r.*, 9 W. Va. 41."

It is claimed that Crim cannot enforce the lien of the State judgment for his benefit under the rule laid down in the case of *Hoffman* v. *Shields*, 4 W. Va. 490, because the State can not be made defendant to the suit. It seems to us that this rule can not be applied where a surety pays a judgment of his principal rendered in favor of the State. This, in reason, must constitute an exception to the rule. A party should not be compelled to lose his right as surety in the payment of a judgment simply because such judgment was rendered in favor of the State, and we hold that a surety who pays a judgment in favor of the State is entitled to maintain a suit for the enforcement of the lien thereon for his benefit, without making the State a party to the suit.

The only other question remaining, is the exception taken to the deposition of Crim, who testifies in effect, that he is the owner of certain of the debts reported by the commissioner. This testimony is claimed to be evidence of a personal transaction between Crim and Wood, rendering it inadmissible upon the hearing of this cause, Wood having died before the hearing. We do not think this testimony is necessarily evidence of a personal transaction or communication between Crim and Wood. The payment of a judgment as surety for a principal debtor, or the purchase of a judgment does not necessarily imply a personal transaction or communication with the judgment debtor; therefore we think that the exception to the deposition of Crim should have been overruled.

Joshua Wood died previous to the entering of the decree complained of, and when this cause is remanded it should be further proceeded with according to the rules governing the settlement of a decedent's estate.

In what we have said in relation to the debts or liens reported by the commissioner we have had no reference to the accuracy of the amounts of such debts or liens, as we have made no investigation as to the accuracy of the amounts. Generally where we have used in this opinion the expressions, "this cause" or "this case" the cause of *Pickens* v. *Wood* was intended.

For the reasons stated the decree of the circuit court entered in this cause on the 31st day of May 1904, is reversed and the report of commissioner Kittle bearing date the 10th day of April, 1900, is set aside and these causes are remanded to the circuit court of Barbour county to be further proceeded with according to the principles announced in this opinion and according to rules governing courts of equity.

*Reversed.*